IN the INTEREST of J.W.T.,
a Minor Child.

No. D–1742.

Supreme Court of Texas.

Feb. 2, 1994.*

Concurring Opinion by Justice
Hecht Feb. 2, 1994.

Dissenting Opinion by Justice
Enoch June 30, 1993.

Dissenting Opinion on Motion for
Rehearing by Justice Cornyn
March 30, 1994.

A.W. Davis, Jr., Newton, for petitioner.

Tom Oxford, Beaumont, for respondent.

DOGGETT, Justice, delivered the opinion of the Court, in which PHILLIPS,[1] Chief Justice, and GONZALEZ, HIGHTOWER, GAMMAGE, and SPECTOR, Justices, join.

The opinion of June 30, 1993 is withdrawn and the following is substituted. In this case we consider whether, under the Texas due course of law guarantee, a biological father may be denied an opportunity to establish his paternity and claim parental rights.

While living together in 1988, Larry G. and Judy T. conceived a child later named J.W.T. Though still married to Randy T., Judy had planned to marry Larry after resolution of her pending divorce. Judy and Larry together arranged for prenatal care with a local clinic in a contract acknowledging Larry's paternity. Pursuant to that agreement Larry made several payments for obstetric treatment.

Judy and Randy later reconciled and dismissed their divorce action. Before the child's birth, Larry brought an action under the Texas Family Code alleging that he was the father of J.W.T., acknowledging responsibility for child support payments, and requesting a judicial declaration of paternity and recognition of his visitation rights. After

* Editor's Note: Justice Doggett's opinion is substituted for the court's June 30, 1993 opinion which was withdrawn on Motion for Rehearing. Justice Enoch's corrected dissenting opinion filed June 30, 1993 stands as delivered.

1. Chief Justice Phillips does not, however, join in Note 23 of this opinion.

the birth, Larry unsuccessfully attempted to maintain contact with J.W.T. Under court order, the parties submitted to scientific paternity testing, which showed a 99.41% probability that Larry was J.W.T.'s biological father.

Accepting the contention of Randy and Judy that Larry lacked standing under the Texas Family Code to bring any action relating to J.W.T., the trial court rejected Larry's assertion of constitutional rights and dismissed his claim. The court of appeals reversed, determining that Section 11.03(a)(7) of the Texas Family Code, under which Larry was denied standing to sue, violated the due course of law guarantee contained in article I, section 19 of the Texas Constitution. 815 S.W.2d 863. We affirm the judgment of the court of appeals.

### I.

Critical to this appeal is an understanding of the various provisions of the Texas Family Code that affect a putative father's ability to establish parental rights. If, when a child is born, the mother is married to someone other than the biological father, her husband is "presumed" to be the child's actual father, and this "marital presumption" may not be attacked by any party outside the marriage except a government entity. *See* TEX.FAM. CODE §§ 12.02(a), 12.06(a) (Vernon Supp. 1994); *In re M.R.M.*, 807 S.W.2d 779, 782 (Tex.App.—Houston [14th Dist.] 1991, writ denied).

Several provisions of the Code operate in tandem to prevent a man claiming to be a child's biological father from suing either to rebut the marital presumption or to claim parental rights by establishing his paternity. A biological father has standing to sue under the Family Code only if the child he claims has no presumed father, TEX.FAM.CODE § 11.03(a)(7);[2] and the only type of action he may bring is a paternity suit under Chapter 13, which is limited to children who have no presumed father. Id.; TEX.FAM.CODE § 13.-21(a).[3] The marital presumption is irrebuttable in a Chapter 13 suit and, even under Chapter 12, only the husband or wife may deny the husband's paternity of a child born during their marriage. TEX.FAM.CODE § 12.-06(a).[4]

Thus, a biological father of a child with a presumed father is given the opportunity for a hearing before a court to establish parental rights only at the request of another party; he may not himself initiate such proceedings. With Randy's paternity of J.W.T. denied by neither Judy nor himself, Randy remains the legally recognized, "presumed" biological father. Under the provisions of the Family Code, Larry is completely barred from asserting his paternity and claiming any relationship with his apparent natural son, J.W.T.

### II.

Relying on both his biological connection with and actions to accept responsibility for J.W.T., Larry contends that the Family Code's denial of his parental rights violates the command of Article I, section 19 of the Texas Constitution that:

2. Section 11.03. Who May Bring Suit

(a) An original suit affecting the parent-child relationship may be brought at any time by:

    .      .      .      .      .

(7) a man alleging himself to be the biological father of a child *who has no presumed father filing in accordance with Chapter 13 of this code, but not otherwise.* . . .
(Emphasis added).

3. Section 13.21. Voluntary Paternity

(a) If a statement of paternity has been executed by a man claiming to be the biological father of a child *who has no presumed father,* he, the mother of the child, or the child . . . or a governmental entity may file a petition for a

decree adjudicating him as a parent of the child. . . .
(Emphasis added).

4. Section 12.06. Denial of Paternity

(a) In any suit affecting the parent-child relationship, *other than a suit under Chapter 13 of this code, a husband or wife is entitled to deny* the husband's paternity of the child who is the subject of the suit and who was born or conceived during the marriage of the parties. The question of paternity under this section *must be raised by an express statement denying paternity of the child in the spouse's pleadings in the suit,* without regard to whether the spouse is a petitioner or respondent.
(Emphasis added).

No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

Under this provision, Larry seeks an opportunity to prove paternity[5] and to obtain a judicial declaration entitling him to both the rights and the obligations of a "parent." As a "parent," Larry could be appointed a managing or possessory conservator of J.W.T., unless shown not to be in J.W.T.'s best interest. *See* TEX.FAM.CODE §§ 14.01, 14.03. If appointed, Larry would be invested with all of the parental rights recognized by the Family Code, except those that the trial court orders are to be exercised exclusively by Judy, including direction of the child's moral and religious training, management of his estate, access to his services and earnings, right to consent to his marriage or participation in the military, and representation of the child in any legal action. *Id.* §§ 12.04, 14.04, 14.02.

A declaration of paternity would also impose parental duties, including that of financial support and provision for the child of clothing, food, shelter, medical care, and education, as well as contribution to the mother's pre- and post-natal health care expenses. *Id.* § 13.42, 12.04. These duties may be forced upon Larry regardless of whether he attempts to exercise any concurrent rights of parenthood[6]—a paternity suit may be brought at any time by a number of other interested parties whose standing to sue does not depend on the absence of a presumed father. *See, e.g., In re S.C.V.,* 750 S.W.2d 762 (Tex.1988) (mother's suit to enforce child support against biological father of child born during her marriage to another man).

Of all the parties granted standing under the Code, only an alleged biological father's standing depends on the absence of a presumed father. *See* TEX.FAM.CODE § 11.03(a); 13.01. The State, for example, has standing to enforce parental obligations against the biological father of a child born with a presumed father; it can disestablish the presumed father's paternity, introduce evidence to rebut the marital presumption, and institute a Chapter 13 paternity suit against the biological father. *Id.* § 12.06; *see Attorney General of Texas v. Lavan,* 833 S.W.2d 952 (Tex.1992). In short, Larry asks why he cannot assume for himself a responsibility that can be imposed on him by the State, his child, or that child's mother.

### III.

Acceptance of Larry's argument that the due course of law provision guarantees him an opportunity to prove paternity would have been highly improbable at the time of the ratification of our Texas Constitution in 1876. A paternity suit was not permitted in Texas at common law.[7] Under English common law, an onerous burden of overcoming the marital presumption was designed to protect a child from the harsh consequences of a finding of illegitimacy, which included an inability to obtain support from the father or to inherit from either parent.[8] A child could

5. Procedurally, this case is unusual in that the factual foundation for establishing paternity was confirmed by court ordered blood tests before the trial court determined that the biological father lacked standing. In contrast, we contemplate a blood test only after a showing at an initial hearing by the putative father that he has met the standard announced in this writing.

6. Indeed, the presumed father may relieve himself of any of his currently accepted parental obligations at any time by successfully denying his paternity of J.W.T. in a suit under Chapter 12. While now adamantly assuming these burdens, Randy has a ready escape if he ever chooses to discontinue providing for a child that is not his own.

7. *See Home of the Holy Infancy v. Kaska,* 397 S.W.2d 208 (Tex.1965); *L.G. v. F.O.P.,* 466 S.W.2d 41 (Tex.Civ.App.—San Antonio 1971, writ ref'd n.r.e.), *rev'd per curiam, Gomez v. Perez,* 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973).

8. *See, e.g.,* Mary Kay Kisthardt, *Of Fatherhood, Families and Fantasy: The Legacy of Michael H. v. Gerald D.,* 65 TUL.L.REV. 585, 588 (1991) (citing *Earle v. Dawes,* 3 Md.Ch. 230 (1849)); Deborah J. Veneziah, *The Rights of an Illegitimate Child Post–Gomez v. Perez: A Legitimate Situation?,* 12 ST. MARY'S L.J. 199, 200–01 (1980); HOMER H. CLARK, JR., THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES 174 (2d ed. 1988) (citing *Moncrief v. Ely,* 19 Wend. 405 (N.Y.1838); *Allen v. Hunnicutt,* 230 N.C. 49, 52, 52 S.E.2d 18 (1949). *Contra Doughty v. Engler,* 112 Kan. 583, 211 P. 619 (1923)).

Although no common law action was available against the father of an illegitimate child, certain

not be delegitimized by proof of the spouses' lack of access to one another if the husband was present "within the four seas" surrounding England at the time of conception, unless his impotence or sterility was proven.[9] An evidentiary rule known as Lord Mansfield's Rule, first articulated in 1777,[10] further prohibited either the husband or the wife from testifying about lack of access, thus requiring evidence or testimony from sources outside the marriage, which were more difficult to secure. Although widely criticized by legal scholars,[11] this rule was generally embraced by the courts, and then gradually rejected in the twentieth century as the legal disabilities associated with illegitimacy diminished.[12] *See* Kisthardt, *supra* note 8.

These conventions were recognized in *Lane v. Phillips*, 69 Tex. 240, 6 S.W. 610, 611 (1887), in which this court observed with regard to the offspring of an unmarried man and woman who had lived together for twelve years:

> while they are his children in fact, the rules of the common law refuse to recognize them as his children, to impose upon him the duties and obligations which the lawful father cannot avoid, or to confer upon them the right to support and and parental care which the child begotten in wedlock has.

Though conceding that "[t]he harshness of this rule ha[d] long been felt," the court went so far as to question the constitutionality of any statute "which [would] compel the father of an illegitimate child to support it or to contribute to its support." *Id.* Such an enactment

> would most probably be held contrary to such constitutional provisions as provide for equality in public burdens, or would be held to be the exercise of an arbitrary power inconsistent with that relation between the state and the subject which all governments not thoroughly despotic recognize.... [T]he common law, for reasons of public policy, refused to enforce [a father's duty to support his illegitimate offspring]; it would be difficult to justify a law enforcing or imposing a personal obligation upon the sole ground that its enforcement would compel the performance of a merely moral duty.

*Id.*[13] Having "recogniz[ed] his natural and moral obligation" of support, the father, together with the children and their mother, were nevertheless held to have "constituted such a family as entitled to the homestead exemption." *Id.* at 612.

Despite the harsh rules governing the legal relationship between illegitimate children

---

quasi-criminal procedures could be brought for support. *See* CLARK, *supra*, at 174 (citing Helmholz, *Support Orders, Church Courts, and the Role of Filius Nullius: A Reassessment of the Common Law*, 63 VA L.REV. 431 (1977) *and* Helmholz, *Bastardy Litigation in Medieval England*, 13 AM.J.LEGAL HIST. 360 (1969)). These procedures were not, however, made a part of the legal heritage brought to this country from England. *Id.* at 174.

9. *See* Kisthardt, *supra* note 8, at 589.

10. *See Goodright v. Moss*, 2 Cowp. 291, 98 Eng. Rep. 1257 (1777).

11. *See* MICHAEL GROSSBERG, GOVERNING THE HEARTH: LAW AND THE FAMILY IN NINETEENTH-CENTURY AMERICA 220 (1985) ("Critics had attacked the doctrine barring spousal testimony on sexual access as inconsistent and unfair from the first days of the republic.... John Wigmore ... condemned [the rule] as absurd and unwise....").

12. In addition to the right to financial support from the biological father, *see Gomez v. Perez*,

409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973) (per curiam), an illegitimate child now also has a right to paternal inheritance, *Trimble v. Gordon*, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977), even though the father's paternity has not been established prior to death. *Dickson v. Simpson*, 807 S.W.2d 726, 728 (Tex.1991). An illegitimate child also has a right to share in proceeds of a wrongful death or worker's compensation claim for the death of its father. *See Levy v. Louisiana*, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968); *Weber v. Aetna Casualty*, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972). In *Garza v. Maverick Market, Inc.*, 768 S.W.2d 273 (Tex.1989) and *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220 (Tex.1988), we refused to engraft onto the Wrongful Death Act the somewhat onerous requirements for establishing paternity set forth in either the Probate or Family Codes.

13. The very kind of statute, which this court thought probably unconstitutional in 1887, is today a mainstay in the state's efforts to reduce the welfare rolls by enforcing child support obligations against irresponsible parents. TEX HUM. RES.CODE §§ 76.001–.008.

and fathers, the court nonetheless conferred a right upon a father who assumed the obligations of parenthood. This link of the rights and responsibilities of parenthood is reflected in recent family law developments.

## IV.

Significant twentieth century changes in the resolution of issues affecting the family are reflected in statutes, demographics, alteration of social attitudes toward illegitimate children, and decisions of the Texas courts. With the enactment of the Texas Family Code in 1973, a method was statutorily afforded a putative father to establish his paternity voluntarily. *See* Paul Knisely & Broadus Spivey, *Paternity Determinations in Texas: Five Years Under Chapter 13 of the Texas Family Code*, 20 S.TEX.L.J. 465, 465 (1979). Adoption in 1975 of an involuntary paternity action, by which others could enforce parental duties upon biological fathers, finally secured the right of illegitimate children to obtain paternal support, as mandated in *Gomez v. Perez*, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973).[14] *See* Ernest E. Smith, *Illegitimate Children and Their Fathers: Some Problems with Title 2*, 5 TEX.TECH.L.REV. 613, 614 (1974); *History of the Texas Family Code*, 5 TEX.TECH. L.REV. 267, 268 (1974). The new statutory paternity action applied, however, only with regard to those children born to an unwed mother, and the marital presumption was codified without any mechanism for its rebuttal. *See* § 12.02, Act of June 15, 1973, 63rd Leg., R.S., ch. 543, 1973 Tex.Gen.Laws 1420.

After paternity suits became statutorily available, this court overruled its prior recognition of Lord Mansfield's Rule. *Davis v. Davis*, 521 S.W.2d 603 (Tex.1975). Because an illegitimate child had rights vis-a-vis the true biological father, attempts to preserve the fiction that the mother's husband was the father no longer necessarily protected the child's best interest:

> Rules that exclude evidence bearing directly on the truth to be determined ought not to survive without very good cause.... Some courts have said that the Rule is required for the protection of the child. This may or may not be its consequence. It may be harmful to the interest of the child.

*Id.* at 607.

Under *Davis*, however, the marital presumption continued to bar delegitimization absent testimony regarding non-access or sterility. If married and living together as husband and wife, neither spouse could rebut the marital presumption, not even with scientific evidence of another's paternity. *See Clark v. Clark*, 643 S.W.2d 795 (Tex.App.— Fort Worth 1982, no writ); *Magana v. Magana*, 576 S.W.2d 131 (Tex.Civ.App.—Corpus Christi 1978, no writ). Not until 1983 was the husband/presumed father statutorily permitted, under Section 12.06 of the Family Code, to deny paternity of a child born to his wife during their marriage, and to seek court-ordered blood testing to disprove paternity. *See* Act of Sept. 1, 1983, 68th Leg., R.S., ch. 424, § 7, 1983 Tex.Gen.Laws 2355. In 1987, the same right was accorded the wife. *See* Act of June 18, 1987, 70th Leg., R.S., ch. 689, § 5, 1987 Tex.Gen.Laws 2548.

Though now considered a limitation on attempts to disestablish presumed paternity,[15] Section 12.06 was initially deemed "the destruction of the nearly irrebuttable presumption of legitimacy," and hailed as "enthron[ing] science as the supreme arbiter" of paternity. John J. Sampson, *Title 2. Par-*

---

**14.** This decision represents one of the major developments in the evolution of the rights of illegitimate children. See Paul Knisely & Broadus Spivey, *Paternity Determinations in Texas: Five Years under Chapter 13 of the Texas Family Code*, 20 S. TEX. L.J. 465, 468 (1979). Today, all states provide some method for compelling fathers to support their illegitimate children. CLARK, *supra* note 8, at 174–75.

**15.** Section 12.06, which had permitted only the husband and wife to deny the presumed father's paternity, was the converse of Lord Mansfield's

Rule, which barred both spouses from denying paternity and required the testimony of outsiders to rebut the presumption of legitimacy. *Compare In re M.R.M.*, 807 S.W.2d 779 (Tex.App.—Houston [14th Dist.] 1991, writ denied) *with Pinkard v. Pinkard*, 252 S.W. 265 (Tex.Civ.App.—Beaumont 1923, no writ). Section 12.06 has now been amended to permit the State to deny the presumed father's paternity. Act of June 16, 1993, 73rd Leg., R.S., ch. 730, § 3, 1993 Tex. Gen.Laws 2866.

*ent and Child*, 1986 TEXAS FAMILY CODE SYMPOSIUM, 17 TEX.TECH.L.REV. 1065, 1151 (1986). Permitting the scientific truth about paternity to govern the legal relations between the real people affected by court rulings promoted certainty and stability:

> [O]nce the subject has been broached, the only way that the parties will ever function on a reasonably civilized basis is to settle once and for all whether the husband indeed is the father of the child. After doubt has arisen on that question, the chance for compliance with child support orders, the establishment of a reasonable parent-child relationship between the to-be ex-husband and the child, and all the other innumerable aspects of the relationship are contingent on the man's knowledge of the truth regarding his suspicion.

*Id.*

Married parents separate, live with others, divorce, and remarry—sometimes each other. More than one quarter of the children in this country are born to unmarried mothers, and with the prevalence of divorce, an even greater proportion of children live in households in which one or both of their natural parents are absent. *See* STATISTICAL ABSTRACT OF THE UNITED STATES 69, 54 (1992). These trends remain a part of the social structure within which our judicial system operates.[16]

The Texas Family Code no longer employs the term "illegitimacy." *See* Act of Sept. 1, 1989, 71st Leg., R.S., ch. 375, 1989 Tex.Gen. Laws 1477–87 (adopting "child who has no presumed father" to replace the term "illegitimate child" throughout the Family Code). Nor do we require Family Code legitimation as a prerequisite to a child seeking recovery for the loss of a natural father. *Garza v. Maverick Market, Inc.*, 768 S.W.2d 273 (Tex. 1989).

Human physiology has not changed, but our understanding of it has. Current methods of scientific testing provide more reliable and less intrusive means of determining paternity. Under the current Family Code, the court is required to order the mother, alleged father, and child to submit to scientifically accepted paternity testing that excludes at least 99% of the male population from the possibility of parentage. TEX.FAM.CODE § 13.02 (Vernon Supp.1994). And advances in genetic testing techniques can accommodate this requirement. *See* Margery W. Shaw & Miriam Kass, *Illegitimacy, Child Support, and Paternity Testing*, 13 HOUS. L.REV. 41, 52 (1975).

V.

We have recognized the adaptability to such changes of our state's fundamental governing law and found considerable strength in the organic nature of its command. *Davenport v. Garcia*, 834 S.W.2d 4, 19 (Tex.1992, orig. proceeding).

In asserting a due course of law claim, Larry must establish that his interest is constitutionally protected. *See Tarrant County v. Ashmore*, 635 S.W.2d 417, 422 (Tex.1982) (extending due course protection to interest of official in elected position); *see also Rogers v. Texas Commerce Bank—Reagan*, 755 S.W.2d 83 (Tex.1988) (per curiam) (deprivation of rights without hearing violates art. I, § 19); *Kramer Trading Corp. of Texas v. Lyons*, 740 S.W.2d 522, 524 (Tex.App.—Houston [1st Dist.] 1987, no writ) (protecting constitutional right under art. I, § 19).

In previous decisions, we have accorded great respect for the biological bond between parent and child. In *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex.1976), we recognized that "[t]he natural right which exists between parents and their children is one of constitu-

16. Some of these interests have been statutorily protected. As "a person who has had actual possession and control of the child for at least six months immediately preceding the filing of the petition," a stepparent, or a disestablished presumed father, now has standing to sue under Section 11.03(a)(8), and "a grandparent or other person deemed by the court to have had substantial past contact with the child sufficient to warrant standing" may intervene in a suit pursuant to Section 11.03(c). These non-parents are not, however, subject to a duty of support. *See Mata v. Moreno*, 601 S.W.2d 58, 59 (Tex.Civ.App.—Houston [1st Dist.] 1980, no writ); *Blalock v. Blalock*, 559 S.W.2d 442 (Tex.Civ.App.—Houston [14th Dist.] 1977, no writ). *See generally* Brenda J. Runner, *Protecting a Husband's Parental Rights When His Wife Disputes the Presumption of Legitimacy*, 28 J.FAM.L. 115 (1989).

tional dimensions." *Accord Holick v. Smith,* 685 S.W.2d 18, 20–21 (Tex.1985); *In re G.M.,* 596 S.W.2d 846 (Tex.1980). Similarly, in *Gunn v. Cavanaugh,* 391 S.W.2d 723 (Tex. 1965), we declared that

> the rights of the natural parent are of high importance and due process properly requires that the burden of proof to show forfeiture of parental rights rests upon [whomever challenges those rights].

We have nonetheless tempered these decisions by recognizing that the rights of natural parents are not absolute; protection of the child is paramount. *See id.* The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities. *See, e.g.,* TEX.FAM.CODE § 14.03(d) (parental visitation may be refused when such would "endanger the physical or emotional welfare of the child").

■ To determine the extent of procedural rights to which a biological father is entitled, we must consider the public interest in protecting the child along with the father's constitutional interest in establishing a relationship with his child. In a situation such as that presented here where the biological father does assert his interest [17] near the time of the child's birth,[18] standing is constitutionally mandated if he both 1) acknowledges responsibility for child support or other care and maintenance, and 2) makes serious and continuous efforts to establish a relationship with the child. In *In re K.,* 535 S.W.2d 168, 171 (Tex.1976), we noted the presence of a

> [genuine public] interest in securing stable homes and supportive families for children, [in] distinguish[ing] between the father who has accepted the legal and moral com-

mitment to the family and the father who has not done so.

This emphasis on the father's commitment to parental duties is consistent with that reached under the due process provision of the Louisiana Constitution. *See In re Adoption of B.G.S.,* 556 So.2d 545 (La.1990). There, the court explained that

> [t]his [constitutional] interest does not come into existence or is soon lost, however, if the father is unable to demonstrate that he is fit and committed to the responsibilities of parenthood. Moreover, he must show that he has taken concrete actions to grasp his opportunity to be a father and that there is a potential for him to make a valuable contribution to the child's development. Consequently, the mere existence of a biological link and fitness will not sustain the father's interest; it is defeasible if not preserved by dedicated, opportune fatherly action.

*Id.* at 550.[19]

To permit proof of such an interest, Texas courts have sought to ensure a fair hearing to a putative father. As we concluded in *In re K.:*

> the biological father of an illegitimate child [has] the opportunity to prove which category [accepting commitment or not accepting responsibility for the child] in which he falls and to show that he should not be treated differently from fathers legally committed to the mothers of their children. Thus [the putative father] sought and received a fair hearing.

535 S.W.2d at 171. Similarly, in *Rogers v. Lowry,* 546 S.W.2d 881, 884 (Tex.App.— Houston [1st Dist.] 1977, orig. proceeding), the court held that: "[A] child's biological

---

**17.** Justice Enoch qualifiedly recognizes such an interest, but only if the biological father has actually established a relationship with a child. 872 S.W.2d at 202 n. 5. (Enoch, J., dissenting). The difficulty with this view is that the very statutory provisions that we consider today enable the mother to entirely obstruct this relationship.

Gender is the preeminent consideration for Justice Cornyn. While he would accord an adulterous married woman near absolute rights to her child, he believes that her adulterous male partner "has few if any rights." 872 S.W.2d at 213 (Cornyn, J., dissenting).

**18.** A delay by the biological father in asserting parental rights long after the child has established a relationship with the presumed father is certainly a factor a trial court should consider in balancing these interests.

**19.** Due process rights of a biological father were also recognized in *In re Adoption of Kelsey S.,* 1 Cal. 4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216 (1992); *In re Lisa R.,* 13 Cal.3d 636, 119 Cal. Rptr. 475, 532 P.2d 123 (1975); *see also Slawek v. Stroh,* 62 Wis.2d 295, 215 N.W.2d 9 (1974).

father has such a substantial interest in the [adoption] proceeding that due process requires he be afforded notice and an opportunity to be heard." *See also In re C.D.V.,* 589 S.W.2d 543, 547 n. 3 (Tex.Civ.App.—Amarillo 1979, no writ) (to avoid due process implications, preferable to provide notice of adoption proceedings to biological father). While these cases recognized only the importance of providing due process to fathers of illegitimate children, we conclude that the right to be heard does not cease merely because the mother is married.

While federal jurisprudence may be useful in understanding our state constitutional guarantees, *see Davenport,* 834 S.W.2d at 20, the help on the question presented here is limited by the sharp divisions present in the consideration of a claim similar to Larry's in *Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989).[20] *Michael H.,* the putative father, challenged the conclusive presumption created by a California statute that a man cohabiting with his wife was the biological father of a child born during the marriage. *Id.* at 119–20, 109

S.Ct. at 2339–40. Notwithstanding both his biological fatherhood and participation in rearing his daughter, *Michael H.* was found by a four-member plurality to possess no interest deserving constitutional protection,[21] despite recognition by the other five members of the Court[22] that this holding was in apparent conflict with recent application of the federal Due Process clause to biological fathers. *Id.* at 133, 109 S.Ct. at 2347 (Stevens, J., concurring); *id.* at 142, 109 S.Ct. at 2352 (Brennan, J., dissenting); *id.* at 158–59 at 129, 109 S.Ct. at 2360–61 at 2345 (White, J., dissenting) (citing *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)); *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); *see also* Note, *Rebutting the Marital Presumption: A Developed Relationship Test,* 88 CoLUM.L.REV. 369, 379 (1988) (predicting, prior to *Michael H.,* that a statute creating an irrebuttable presumption would violate the federal due process rights of a putative father).

*Michael H.* was, consequently, considered an aberration—"the plurality's departure"

---

**20.** There were actually five opinions in this 4–1–4 split decision: A plurality opinion by Justice Scalia, joined in its entirety by Chief Justice Rehnquist and in part by Justices O'Connor and Kennedy; a separate concurrence by Justices O'Connor and Kennedy; a concurrence by Justice Stevens; and separate dissents by Justice Brennan, joined by Justices Marshall and Blackmun, and by Justice White, joined by Justice Brennan. *See id.*

**21.** Rather than ask whether parenthood is an interest that has traditionally received recognition and protection, Justice Scalia, as author of the plurality, assessed the historical support for "the right of the natural father of a child conceived within, and born into, an extant marital union that wishes to embrace the child." *Id.* at 127, 109 S.Ct. at 2344. Two of the four Justices joining his opinion, however, wrote separately to disapprove of that portion of the decision and to point out its inconsistency with the interpretive method employed in prior decisions under the Due Process Clause. *See id.* at 111, 109 S.Ct. at 2335 (O'Connor and Kennedy, JJ., concurring); *see also* Note, *Michael H. v. Gerald D.: The Constitutional Rights of Putative Fathers and a Proposal for Reform,* 31 B.C. L. REV at 1201.

**22.** *The disputed California statute was upheld* because Justice Stevens concurred with the plurality, despite his disagreement with Justice Scalia's "reject[ion] [of] the possibility that a natural

father might ever have a constitutionally protected interest in his relationship with a child whose mother was married to and cohabiting with, another man at the time of the child's conception and birth." *Id.* 491 U.S. at 133, 109 S.Ct. at 2347 (Stevens, J., concurring). Justice Stevens "assume[d] for the purpose of deciding [the] case" that Michael's relationship with his daughter deserved due process protection, noting that recent cases, such as *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), "demonstrate that enduring 'family' relationships may develop in unconventional settings." He nevertheless found *sufficient safeguard for Michael's interest* in California's statutory authorization for trial court discretion in allowing anyone with an interest in a child to gain visitation rights. *Id.* at 133, 109 S.Ct. at 2347. *See* Kisthardt, *supra* note 8, at 612. The Texas Family Code affords no comparable right. Section 11.03(c) permits a person "deemed by the court to have had substantial past contact with the child sufficient to warrant standing," a right of intervention in a suit filed by someone authorized to sue under subsections 11.03(a) or (b); by its terms this would exclude the putative father. Even though the tenuous coalition that produced a judgment in *Michael H.* might well have decided the instant case differently than Justices Cornyn and Enoch now suggest, speculating how another court would resolve this matter is hardly determinative of our decision.

from previous federal decisional law—by the Louisiana Supreme Court in *In re Adoption of B.G.S.*, 556 So.2d at 549–50 n. 2, and is perhaps best described in Justice Brennan's dissent:

The atmosphere surrounding today's decision is one of make-believe. Beginning with the suggestion that the situation confronting us here does not repeat itself every day in every corner of the country, moving on to the claim that it is tradition alone that supplies the details of the liberty that the Constitution protects, and passing finally to the notion that the Court always has recognized a cramped vision of "the family," today's decision lets stand California's pronouncement that Michael— whom blood tests show to a 98 percent probability to be Victoria's father—is not Victoria's father. When and if the Court awakes to reality, it will find a world very different from the one it expects.

*Michael H.*, 491 U.S. at 128, 109 S.Ct. at 2345 (Brennan, J., dissenting); *see also In re Adoption of Kelsey S.*, 1 Cal.4th 816, 4 Cal. Rptr.2d 615, 627, 823 P.2d 1216, 1228 (Cal. 1992) (stating "we must not read too much into *Michael H.*," and relying on that case for the proposition that five justices recognized unwed father's liberty interest). It is wholly under our Texas due course of law guarantee, which has independent vitality, separate and distinct from the due process clause of the Fourteenth Amendment to the U.S. Constitution,[23] that we reach today's decision.

## VI.

Randy and Judy insist that Larry's right to be heard may be statutorily denied. They argue that, by prohibiting an alleged biological father from asserting his paternity, the Family Code protects the marital unit from intrusion by outsiders and protects the child from delegitimation. The State has a legitimate interest in minimizing familial disruptions that are harmful to the child. But as the court of appeals observed, this marital unit was clearly disrupted before Larry ever filed this suit:

[t]hat the biological mother, for whatever reason, has chosen to engage in sexual relations outside of marriage is proof itself that the "integrity and solemnity of the family unit" has been damaged at least to some degree. [Resolution of these difficulties by the husband and wife] does not, we feel, give license to the state to perpetuate the myth of "presumption of paternity" so as to deprive the biological father of at least a chance of being able to exercise those rights, duties, privileges, and responsibilities that all civilized societies have recognized to be fundamentally ingrained in the concept of parenthood.

815 S.W.2d at 869.

Perhaps this asserted interest had merit in an earlier era when the true biological father could not be established with near certainty and when illegitimacy carried a significant legal and social stigma. Since this is no longer the case,[24] the focus should more properly be directed toward what is best for the child—it may be in best interest of the child to allow development of a relationship with the natural father and it may not.[25] The effect of the alternative offered by the dissenting justices is to leave this determination of the child's best interest and the definition of family, itself, exclusively to the biological mother. In the name of protecting the family, Justice Enoch would grant rights to putative fathers who had been permitted by

---

**23.** As recognized in *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 293, 102 S.Ct. 1070, 1076, 71 L.Ed.2d 152 (1982): "[T]he language of the Texas [due course] constitutional provision is different from, and arguably significantly broader than, the language of the corresponding federal provisions."

**24.** "[T]he original reasons for the conclusive presumption of paternity are out of place in a world in which blood tests can prove virtually beyond a shadow of a doubt who sired a particular child and in which the fact of illegitimacy no longer

plays the burdensome and stigmatizing role it once did." *Michael H.*, 491 U.S. at 140, 109 S.Ct. at 2351 (Brennan, J., dissenting).

**25.** Status as a "parent" under the Family Code does not guarantee a relationship with the child. The trial court may refuse to award visitation if "it finds that parental possession or access is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child." TEX FAM CODE § 14.03(d).

the mother to develop a relationship with the child but not to those not afforded that opportunity. 872 S.W.2d at 202 n. 5. (Enoch, J., dissenting).

To Justice Enoch, Larry is only "a stranger to the marriage into which the child is born," *id.* at 200, despite having lived with the mother during the marriage, as well as their mutual arrangements for prenatal care. This relationship is morally judged, rather than legally judged, being dismissed as a mere "dalliance," *id.* at 200 n. 1, without explaining why the rights accorded to one participant in their relationship should overwhelm those of the other. The father is a "stranger," if that term has any relevancy to this issue, only in so far as the statutory law has traditionally deprived him of rights.

■ We do not say that our Constitution guarantees every natural father ties with his illegitimate offspring.[26] We do say that one who is arbitrarily prevented from attempting to establish any relationship with his natural child, after making early and unqualified acceptance of parental duties as Larry has done, is denied due course of law under section 19 of our Texas Bill of Rights. Those provisions of the Family Code that bar Larry's pursuit of his parental rights violate our constitutional guarantee that every Texan shall be accorded due course of law. We, therefore, hold unconstitutional Section 11.-03(a)(7)· and 12.06(a) to the extent that they wholly deny a putative father's standing to sue with regard to a child who has a presumed father, and prevent the bringing of any suit affecting the parent-child relationship in which a presumption of paternity may be rebutted.[27]

The judgment of the court of appeals is affirmed and this cause is remanded to the trial court for further proceedings consistent with this opinion.

HECHT, Justice, concurring.

[Filed Feb. 2, 1994]

I agree with the Court that a father's interest in his child is so fundamental an aspect of individual liberty that it cannot be denied by the State except by due course of law, as guaranteed by article I, section 19 of the Texas Constitution. It seems to me almost intuitive that in a free society the State cannot deny a man all right to his child without due process, and I should have thought this principle "too clear for dispute", *Michael H. v. Gerald D.*, 491 U.S. 110, 139, 109 S.Ct. 2333, 2350, 105 L.Ed.2d 91 (Brennan, J., dissenting), but for the dissenting opinions in this case. To dispel the doubt they raise whether parenthood is a constitutionally protected interest, the authorities on

---

**26.** Justice Cornyn expresses concern that four adoption agencies believe that "under this court's decision there is no impediment to a putative father asserting parental rights to a child who has been adopted." 872 S.W.2d at 221. Yet this point was raised only in a single short *amicus* brief, as a rhetorical question about the decision of the court of appeals:

> If the current statutory scheme is invalidated, then what is to prevent an alleged biological father who has not relinquished his purported parental rights from coming forward to challenge the legal relationship between an adoptive father and his adoptive child and to disrupt the sanctity of the adoptive family? Such is the effect of the *Beaumont court's* invalidation of the Texas Family Code's restrictions on rebutting the paternity presumption.
> (emphasis added).

An examination of the Family Code indicates that our decision does not jeopardize the adoption process. Once an adoption petition has been granted, a paternity suit is prohibited. Tex. Fam Code § 13.44. An alleged or probable father is entitled to notice prior to the termination of parental rights—a prerequisite to a valid adoption. *Id.* §§ 15.023; 11.09(a)(8); 16.03. But if, after receiving notice, the alleged father fails to respond by filing an admission of paternity, the Code specifically provides that his parental rights may be involuntarily terminated in order to complete an adoption. *Id.* § 15.023. Noncompliance with these provisions would certainly appear inconsistent with the requirement set forth here that the biological father demonstrate a prompt assumption of parental duties. An adoption decree may not in any event be attacked more than two years after it is entered. *Id.* § 16.12.

During the extended period that this motion for rehearing has been pending, while the writings of others were being prepared, no adoption agency or any other person or entity has suggested to this Court that any of the horrors envisioned by Justice Cornyn comport with reality.

**27.** We therefore disapprove the contrary holding in *Jack v. Jack*, 796 S.W.2d 543 (Tex.App.—Dallas 1990, no writ).

which the Court relies to find this interest are more than persuasive.

In the past, the law did not as a rule recognize the right of parenthood in a man who claimed to be the father of the child of a married woman. The reason, it seems to me, was merely that until recently it was impossible to determine the validity of such claims to any acceptable degree. Advancements in medical technology which can often predict, almost to a certainty, whether a man's claim of paternity is valid remove that hindrance to acknowledging the right of parenthood. The right is not, of course, absolute. A father cannot assert his interest if he has obtained it by force, that is, by rape, or by fraud or other wrongdoing. Such circumstances are governed by the ancient maxim: *nullus commodum capere potest de injuria sua propria.* Also, the interest can be terminated by the father voluntarily, as in the case of adoption, and against the father involuntarily, as when he is adjudicated to have knowingly endangered the child's wellbeing.

Acknowledging the right of a biological father in such circumstances does not preclude the existence of other equal rights. I should have thought it manifest that the "sanctity of the family ... is [so] deeply rooted in this Nation's history and tradition", *id.* at 124, 109 S.Ct. at 2342 (Scalia, J., plurality), that the interests of its members in preserving its unity are also constitutionally protected. Any doubt cast upon the existence of such interests by the Court's failure to acknowledge them is completely dispelled by authorities cited by JUSTICE ENOCH.

Thus, it seems to me that two constitutionally protected interests are involved in this case—parenthood and preservation of the family—and they are in conflict. The State has chosen to resolve this conflict by denying the biological father of a child who has a presumed father any standing to assert his interest. In all such circumstances, the family interest is made paramount by statute. I agree with the Court that the State has no reason or purpose sufficient to deny every biological father the right to assert his interest in a child simply because there is a presumed father. When a biological father acknowledges his responsibility to help support the child and has made every reasonable effort to establish a relationship with the child, he is entitled to assert his interest in the child, notwithstanding the opposition of the mother and her husband.

He is not, however, necessarily entitled to prevail in his assertion. I agree with the Court that in determining what rights a biological father may have in his child, the best interest of the child must be considered. I do not agree with the implication in the Court's opinion—it is really only an implication and nothing more—that the best interest of the child is the only, or always the paramount, consideration. The interests of the mother and her husband in preserving their family unit exclusive of the biological father are equal in dignity to the biological father's interest and entitled to equal consideration. Such interests are especially important when the best interest of the child is unclear. For example, when it appears that a child would do as well or better with his biological father as with his mother and her husband, should the biological father be allowed visitation if his continued presence in the child's life would almost certainly imperil the stability of the mother's marriage? I suspect this situation is commonplace, and I cannot see how consideration of the best interest of the child alone supplies the solution.

The Court does not exclude family interests from consideration in determining what rights should be awarded a biological father. I presume therefore that such interests can and should be fully considered. With this understanding, I concur in the judgment of the Court.

ENOCH, Justice, dissenting.

[Filed June 30, 1993]

The question in this case is not whether a man who alleges himself to be the biological father of a child born during the marriage of the mother to another man will be entitled to parental rights to the child. The question is whether this stranger to this marriage[1] has

---

1. The Court suggests that Larry G. is not a stranger to the marriage because he lived with the mother briefly when she had separated from her husband. Larry is certainly a stranger to the

a constitutionally protected interest that entitles him to challenge and petition in the first instance for paternity of a child born into that marriage, despite the fact that neither the mother, the presumed father, nor the child have disputed the presumed father's paternity. In so holding, the Court concludes that sections 11.03(a)(7) and 12.06(a) of the Texas Family Code, which do not permit a putative father to petition for paternity where the mother is *not* unwed, violate the due course of law guarantee of the Texas Constitution. TEX.CONST.ART. I, § 19. Under the guise of denial of procedural due course of law, the Court is in fact creating a substantive due course of law interest in favor of an putative biological father to challenge paternity and obtain parental rights in derogation of the right of the marital family to protect its children from claims of illegitimacy by outsiders. With this action, I cannot agree. I dissent.

A putative biological father who claims parental rights to a child and who is also a stranger to the marriage into which the child is born does not have a common law, statutory, or constitutional interest that is protected by the Texas Constitution. At common law, a putative biological father could not bring an action for paternity. *See Home of the Holy Infancy v. Kaska,* 397 S.W.2d 208 (Tex.1965); *L.G. v. F.O.P.,* 466 S.W.2d 41 (Tex.Civ. App.—San Antonio 1971, writ ref'd n.r.e.), *rev'd per curiam, Gomez v. Perez,* 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973). A putative biological father has only those rights conferred by the Texas Family Code. Section 11.03 of the Family Code provides that a putative biological father may bring a suit to establish paternity only of a child who has no presumed father, but not otherwise. TEX.FAM.CODE ANN. § 11.03(a)(7). Because the putative biological father had no right at common law to maintain an action for paternity in any circumstances, the enactment of

section 11.03 did not deprive him of any existing procedural remedy. Accordingly, the only question is whether a putative biological father who is a stranger to a marriage has a constitutionally created and protected interest to challenge and petition for paternity of a child born into a marriage.

The cases relied on by the Court in recognizing a constitutionally protected interest in favor of a putative biological father are not applicable. None of the cases cited by the Court involved a situation in which a stranger to a marriage sought the right to challenge and establish paternity of a child born into the marriage when neither the parties to the marriage nor the child were disputing the paternity of the child.

In reaching its decision, the Court also rejects a United States Supreme Court holding directly on point. In *Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), the Supreme Court held that a putative biological father was not deprived of any due process rights by a state statute that prevented him from petitioning to establish his paternity of a child born into a marriage. The Court dismisses *Michael H.* as an "aberration." [2] 872 S.W.2d at 196. To the contrary, *Michael H.* simply reflects a determination that not all parental-related rights are to be given the same stature and constitutional import, a distinction which this Court fails to recognize. For example, in *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the United States Supreme Court afforded constitutional recognition and due process protection to a putative biological father who had "sired and raised" his children born out of wedlock. There, the Supreme Court held unconstitutional a statute that automatically placed children as wards of the state upon the death of their unwed mother without a hearing of fitness of the unwed father or proof of neglect. 405 U.S. at 658, 92 S.Ct. at 1216. The

marriage in the plain and simple sense that he is not a party to the marriage. The fact that Larry may have lived with Judy for four months does not make Larry any less a stranger to the marriage. The Court's ruling today raises a dalliance to a constitutionally protected interest.

2. In the same breath that the Court rejects *Michael H.* as authoritative or dispositive on state

Constitutional issues, the Court relies on another United States Supreme Court decision, *Caban v. Mohammed,* 441 U.S. 380, 389, n. 7, 99 S.Ct. 1760, 1766 n. 7, 60 L.Ed.2d 297 (1979), to support its recognition under our state's Constitution of a constitutionally protected interest in favor of the putative father in this case.

natural father who had lived with and raised the children claimed that the statute violated his due process rights. Although discussed in terms of the individual right of Mr. Stanley, the interest protected in *Stanley* is clearly an interest in preserving integrity of the family unit.[3] *Id. at* 651, 92 S.Ct. at 1212. The interest protected in *Stanley* is far different from the interest claimed by a putative biological father who challenges the paternity of a child born into a marriage and who is in the eyes of the law and, in actuality, a stranger to the marriage and to the child.

Although this Court is not bound by the decisions of the United States Supreme Court in construing the due course of law provision of the Texas Constitution, I find the decisions of the United States Supreme Court, and in particular, *Michael H.,* instructive and persuasive. *See also Jack v. Jack,* 796 S.W.2d 543 (Tex.App.—Dallas 1990, no writ). Even assuming that our due course of law provision is broader and protects interests not protected by the Due Process Clause of the United States Constitution, I find nothing in the jurisprudence of this State to suggest that Texas has traditionally protected and recognized the interests of an adulterous putative father to establish and obtain parental rights over the objection of the mother and presumed father and to the derogation of the marital family's right to protect its children from claims of illegitimacy by outsiders. Accordingly, I would conclude that Larry G., the putative biological father, does not have a constitutional interest protected under Article I, section 19 of the Texas Constitution to challenge and petition for paternity of a child born into a marriage

between a woman and another man, and consequently, he has not been deprived of due course of law by sections 11.03(a)(7) and 12.06(a) of the Texas Family Code.

Even if Larry G. has a constitutionally cognizable interest, the Court ignores a powerful countervailing interest, the family's right to be free from unwanted interference and disruption by state sanctioned attempts to delegitimize the children of a marriage.[4] *See Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (recognizing and detailing history of constitutional protection for sanctity of family from unwanted intrusion absent compelling state interest). In *Stanley, supra,* the United States Supreme Court held that a putative biological father's interest warranted due process protection "absent a powerful countervailing interest." *Stanley,* 405 U.S. at 651, 92 S.Ct. at 1212. Contrary to *Stanley,* in which Stanley's individual interest was synonymous with preservation of the family, the family interest in this case is a powerful countervailing interest; an interest which promotes the marital relationship, preserves intact and protects an existing family from disruption and interference by external forces, and protects the child from confusion, torn affection, and the stigma of illegitimacy. *See Moore,* 431 U.S. at 499–500, 97 S.Ct. at 1935–36. *See A. v. X, Y, and Z,* 641 P.2d 1222 (Wyo.1982); *Petitioner F. v. Respondent R.,* 430 A.2d 1075 (Del.1980).

In failing to recognize the significant countervailing constitutional interests of the family to be free from unwanted interference and attack by strangers, the Court has rendered the putative biological father's right to peti-

---

**3.** In *Michael H.,* the plurality specifically noted that *Stanley* and *Caban* rested upon the sanctity traditionally accorded to relationships that develop within the unitary family. 491 U.S. at 123, 109 S.Ct. at 2341.

**4.** The Court generally dismisses the family unit's interest in protecting its children from claims of outsiders because paternity can be determined with greater certainty through scientific testing. 872 S.W.2d at 197. I would not consider the accuracy of scientific testing to be the basis either for diminishing the family's interests or promoting the putative biological father's rights to constitutional proportion.

The Court specifically dismisses this family unit's entitlement to protection of its interest

because of the mother's affair with the putative biological father when the couple had separated and filed for divorce. The Court's moralistic judgment is inappropriate, but more to the point, the question presented is not whether Larry will win his claim to parental rights (*e.g.,* custody or visitation), the question is whether he has the right to challenge paternity in the first instance. The facts of this case are irrelevant to the question because they are not developed for the record until after the challenge is permitted to be made. In any event, in this case, the mother and the presumed father reconciled before the child's birth, have continued to live together as a married couple, and have embraced and raised the children born of their marriage as their own.

tion for paternity absolute and superior to any rights of the family. To give constitutional weight to the interests of a stranger, albeit the putative biological father, without regard to the interests of the family and the state in protecting the family would invite actions by persons whose only purpose is to break up the family to satisfy a jealous or revengeful feeling.[5] Where a child is born into a marriage, there are contradictory interests between the putative biological father and the family. The state cannot afford both the putative biological father and the family absolute interests. In the provisions of the Texas Family Code, the state has given preference to the interests of the family to be free from unwanted and disruptive interference.

Because the nature of the interest sought to be protected by the Court in favor of putative biological fathers is in reality a substantive due process interest rather than a procedural due process right, the interest is not absolute. Sections 11.03(a)(7) and 12.-06(a) do not impinge on a putative biological father's substantive due process interest if they are rationally related to a legitimate state interest.[6] Tex.Const.Art. I, § 19, *commentary*. I would hold that the legislature's preference for the interests of the family are rationally related to the state's interest in protecting and promoting the interests of the existing marriage and family unit and that sections 11.03(a)(7) and 12.06(a) of the Texas Family Code do not violate the due course of law guarantee of the Texas Constitution.

I would reverse the judgment of the court of appeals and affirm the trial court judgment.

### DISSENTING OPINION ON MOTION FOR REHEARING

CORNYN, Justice, dissenting.

[Filed March 30, 1994]

The dissenting opinion of September 15, 1993, 36 Tex.Sup.Ct.J. 1277, is withdrawn and the following is substituted in its place.

Respectfully, I dissent. Aware of the monumental social crisis posed by broken families in our state and nation, the legislature could have rationally chosen to protect the marital family over any right that the Texas Constitution might confer on a biological father. Elevating its will over the law, the court has substituted its own social policy preferences for those of the people's legitimate representatives.

In identifying new rights granted by the due course clause, the court relies on the "adaptability" of the Texas Constitution to social changes it deems important, rather than our traditional interpretive methods. 872 S.W.2d 189, 194. This form of adaptation permits constitutional amendment via the courtroom, rather than the usual method of constitutional adaptation in Texas—the ballot box. Unlike the United States Constitution, which has been amended only eighteen times since the Bill of Rights was ratified in 1791, the Texas Constitution was amended 338 times between 1876 and 1993. THE DALLAS MORNING NEWS, TEXAS ALMANAC 1994–95, 336 (Mike Kingston ed., 1993). Texans have shown no reluctance to adapt their constitution when changed circumstances so require. If the people actively maintain their constitution as a living document, then this court has even more reason than the United States Supreme Court to remain circumspect about vague notions of constitutional "adaptation" through judicial opinions. As Texas's court of last resort in civil matters, we must exercise our power of judicial review according to a principled interpretive framework. Were the court to follow precedent and judge the statutes at issue under established constitutional standards, the statutes would be sustained. The court, however, disregards more than a century of its own decisions in favor of what it

---

5. *See, e.g., Henderson v. Wietzikoski,* 841 S.W.2d 101 (Tex.App.—Waco 1992, writ denied) (On application for writ of error, the record demonstrated that the putative father waited four years after the birth of the child before he sought to establish paternity and only after the mother called off the affair).

6. Where, as in this case, the putative father has no relationship with the child, his biological relationship to the child alone is insufficient to give rise to a fundamental constitutional interest. *See Stanley,* 405 U.S. at 657–58, 92 S.Ct. at 1215–16.

has divined to be "newly emerging social goals." [1]

While the motion for rehearing of this cause was pending, I wrote a dissenting opinion (1) calling attention to the court's failure to follow its own standards of constitutional interpretation, 36 Tex.Sup.Ct.J. 1277, 1279, (2) noting the suspect nature of its "adaptability" analysis, id. at 1281, and (3) calling for restraint in applying substantive due process, id. at 1281–82, 1285–86. If the court insisted on ignoring our established framework of constitutional analysis, id. at 1282, 1286–87, I urged the court at least to establish some alternative analytic framework. Id. at 1277–78, 1286.

But the court's opinion on motion for rehearing is virtually identical to the original, and reaches the same result without addressing any of those objections. If this case represents nothing more than an announcement by seven judges that they can decide cases without reference to any guiding principle, then it has no precedential value because precedent that frees judges from following precedent need not itself be followed. I can only hope that this case is an aberration, and that in future cases the court will return to the analytic framework it has employed in the past. For as Justices O'Connor, Souter and Kennedy have recently written, "Liberty finds no refuge in a jurisprudence of doubt." Planned Parenthood v. Casey, —— U.S. ——, ——, 112 S.Ct. 2791, 2803, 120 L.Ed.2d 674 (1992).

The court here offers no explanation for why it chooses to disregard the Supreme Court's warning in Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (plurality opinion), and to follow, at least for the moment, a doctrine that has been subject to sharp criticism for more than a century and the use of which has been dramatically curtailed since the late 1930's.[2] Substantive due process is by no means entrenched in our jurisprudence. As CHIEF JUSTICE PHILLIPS has recently observed, the viability of substantive due process under the due course provision of the Texas Constitution is doubtful. Lucas v. United States, 757 S.W.2d 687, 711–14 (Tex.1988) (Phillips, C.J. dissenting).

## I. The Power of Judicial Review

The architects of the Republic of Texas sought to preserve their right to self-governance and individual liberty by limiting the powers of government in a written constitution. They declared in the preamble to the Declaration of Rights in the 1836 Constitution:

And in order to guard against the transgression of the high powers which we have delegated, we declare that everything in this bill of rights contained, and every other right not hereby delegated is reserved to the people.

The Constitution of 1876, our fundamental law today, maintains this principle: "All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit." TEX. CONST. art. 1, § 2; see also TEX. CONST. art. 1, § 29.

Just as it prevents the other branches of government from arbitrarily interfering with the rights of the people, our written constitution limits the scope of judicial review and

---

1. See, e.g., Texas Nat'l Guard Armory Bd. v. McCraw, 132 Tex. 613, 126 S.W.2d 627, 634 (1939); Mellinger v. City of Houston, 68 Tex. 37, 3 S.W. 249, 253 (1887). Ironically, the court has deleted from its former opinion the phrase "newly emerging social goals," see 36 Tex.Sup.Ct.J. 1126, 1130 (June 30, 1993), and replaced it with the phrase "certainty and stability," see 872 S.W.2d at 194 (Tex.1994). It should be readily apparent that the policies the court favors promote anything but "certainty and stability" for Texas children and families, and neither the court's methodology nor its rationale have changed.

2. One of the last clear uses of federal substantive due process to strike down legislation occurred in 1936. See Morehead v. New York, 298 U.S. 587, 56 S.Ct. 918, 80 L.Ed. 1347 (1936) (declaring minimum wage statute unconstitutional as impairing liberty to contract). In the next year, the Court all but eviscerated the doctrine with a tautology. See West Coast Hotel Co. v. Parrish, 300 U.S. 379, 391, 57 S.Ct. 578, 581–82, 81 L.Ed. 703 (1937) (refusing to invalidate statute on due process grounds noting that "[l]iberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process").

the power of the courts to interfere with the citizens' expression of policy choices through their elected legislature. We have repeatedly held that no act of the legislature may be declared unconstitutional unless some provision of the Texas Constitution can be cited which clearly shows the act's invalidity. *See, e.g., Texas Nat'l Guard Armory Bd. v. McCraw,* 132 Tex. 613, 126 S.W.2d 627, 634 (Tex.1939).

Early in our nation's history, the United States Supreme Court rejected the notion of the Court's authority to strike down statutes as "against reason" or in violation of "natural law." *Calder v. Bull,* 3 U.S. 386, 3 Dall. 386, 1 L.Ed. 648 (1798). In the famous Chase–Iridell debate in *Calder v. Bull,* Justice Chase suggested, "An act of the legislature ... contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority." *Calder v. Bull,* 3 U.S. at 388. Justice Iridell responded that decisions based upon such indeterminate notions of "natural law" were irreconcilable with the concept of a written constitution as the nation's fundamental law:

> It is true, that some speculative jurists have held, that a legislative act against natural justice must, in itself, be void; but I cannot think that, under [a written constitution], any court of justice would possess a power to declare it so.... If any act of Congress, or of the legislature of a state, violates those constitutional provisions, it is unquestionably void; though I admit, that as the authority to declare it void is of a delicate and awful nature, the court will never resort to that authority, but in a clear and urgent case. If on the other hand, the legislature of the union, or the legislature of any member of the union, shall pass a law, within the general scope of their constitutional power, the court cannot pronounce it void, merely because it is, in their judgment, contrary to the principles of natural justice. *The ideas of natural justice are regulated by no fixed standard; the ablest and noblest men have differed on the subject;* and all that the court could properly say, would be, that the legislature (possessed of an equal right of opinion) had passed an act which, in the

opinion of the judges, was inconsistent with abstract principles of natural justice.

*Id.* at 398–99 (emphasis added).

In *Marbury v. Madison,* the Supreme Court decision that firmly established the doctrine of judicial review as one grounded in the written constitution, Chief Justice John Marshall wrote:

> The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained....
>
> So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide the case conformably to the law, disregarding the constitution; or conformably to the constitution disregarding the law; the court must determine which of these rules governs the case. This is the very essence of judicial duty.
>
> If, then, the courts are to regard the constitution, and the constitution is superior to any ordinary act of the legislature, the constitution, and not the ordinary act, must govern the case to which both apply.
>
> Those, then who controvert [this] principle ... are reduced to the necessity of maintaining that the courts must close their eyes to the constitution.... This doctrine would subvert the very foundation of all written constitutions....
>
> *[T]he framers of the constitution contemplated that instrument as a rule for the government of the courts as well as the legislature. Why otherwise does it direct the judges to take an oath to support it?*

*Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 176–180, 2 L.Ed. 60 (1803) (emphasis added); *see also* TEX. CONST. art. 16, § 1(a) (Texas judicial oath). We too have traced the legitimacy of our judicial power to the written text of our constitution. *Texas Nat'l Guard Armory Bd.* 126 S.W.2d at 634.

## II. The Texas Rules of Constitutional Interpretation

The preeminent goal of constitutional interpretation is to give effect to the intent of the people who adopted the constitution. *Cox v. Robison*, 105 Tex. 426, 150 S.W. 1149, 1151 (1912); *accord River Oaks Garden Club v. City of Houston*, 370 S.W.2d 851, 854 (Tex.1963). Recently, we referred to this as "our traditional method of constitutional interpretation:"

> In construing [the Texas Constitution], we consider "the intent of the people who adopted it." In determining that intent, "the history of the times out of which it grew and to which it may be rationally supposed to have direct relationship, the evils intended to be remedied and the good to be accomplished, are proper subjects of inquiry." However, because of the difficulties inherent in determining the intent of voters over a century ago, we rely heavily on the literal text.

*Davenport v. Garcia*, 834 S.W.2d 4, 19 (Tex. 1992) (citing *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 394 (Tex.1989)). In approaching this grave task, we begin with the presumption that acts of the legislature are constitutional. *Texas Pub. Bldg. Auth. v. Mattox*, 686 S.W.2d 924, 927 (Tex.1985); *Sax v. Votteler*, 648 S.W.2d 661 (Tex.1983).

Remarkably, the court's opinion in this case contains no reference to any particular standard of constitutional review. Nor does the court identify any language in the text of the constitution justifying its decision. Instead, in deciding the constitutionality of TEX. FAM.CODE ANN. §§ 11.03 and 12.06 (Vernon Supp.1994),[3] the court relies solely on the "due course of law" provision, article I, section 19, of the Texas Constitution:

> No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

This section obviously contains no language specifically addressing family law or the rights of biological parents. Nor is the court's decision premised upon historical rights of biological parents. For as the court itself acknowledges: it is "highly improbable [that] at the time of the ratification of the Texas Constitution" the due course clause would have "guarantee[d] [Larry K.] an opportunity to prove paternity," because a paternity suit was not permitted at common law in Texas. 872 S.W.2d at 191.

Because the federal due process clause[4] and our due course clause are virtually identical,[5] Texas courts have held for over a century that the due course clause "in so far

---

3. Section 11.03. **Who May Bring Suit**
   (a) An original suit affecting the parent-child relationship may be brought at any time by:
      (7) a man alleging himself to be the biological father of a child who has no presumed father filing in accordance with Chapter 13 of this code, but not otherwise....
   Section 12.06. **Denial of Paternity**
   (a) In any suit affecting the parent-child relationship, other than a suit under Chapter 13 of this code, a husband or wife is entitled to deny the husband's paternity of the child who is the subject of the suit and who was born or conceived during the marriage of the parties. The question of paternity under this section must be raised by an express statement denying paternity of the child in the spouse's pleadings in the suit, without regard to whether the spouse is a petitioner or respondent.

4. The due process clause of the Fourteenth Amendment to the United States Constitution provides:
   No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; *nor shall any*

*State deprive any person of life, liberty, or property, without due process of law....*
U.S. CONST. amend. XIV, § 1 (emphasis added).

5. To the extent that minor differences in language might justify different interpretations of the Texas due course clause and the Fourteenth Amendment due process clause, it has been observed:

> The constitution of the Republic of Texas is a composite structure of portions of the constitutions of the United States and of several of the state constitutions in effect at that time. It does not appear that any one state constitution was followed; and where material from the constitution of the United States was incorporated the wording was frequently changed, sometimes to no apparent advantage. Indeed, one is inclined to feel that it would have been much better to have followed Gouveneur Morris's lucid English [of the Fifth Amendment due process clause] more literally.

Rupert N. Richardson, *Framing the Constitution of the Republic of Texas*, 31 S.W.HIST.QUAR. 191, 209 (1928).

as it is identical" to the Fourteenth Amendment, is co-extensive with the Fourteenth Amendment. *Mellinger v. City of Houston*, 68 Tex. 37, 3 S.W. 249 (1887).[6] If the Supreme Court has ruled on an issue under the federal constitution, this court has said that it will follow that ruling unless some difference between the two clauses requires a different result. *Id.* at 253.

### III. How Broad is the Due Course Clause?

In reaching today's result, five members of the court explain that the due course clause has "independent vitality" and is "arguably broader" than the corresponding language in the United States Constitution. 872 S.W.2d at 197 & n. 23. To the extent the court recognizes a due course right that was expressly rejected on due process grounds in *Michael H.*, the court necessarily holds that the due course clause is broader, no matter how CHIEF JUSTICE PHILLIPS chooses

to qualify his assent. *See* 872 S.W.2d 189, n. 1. This approach to the due course clause directly conflicts with the canons of constitutional interpretation that this court has followed since shortly after adoption of the 1876 Constitution.[7] *See Mellinger*, 3 S.W. 249, 253 (Tex.1887). Neither history nor language leads to the court's conclusion. In fact, there is as much reason to believe that the due course clause is generally narrower[8] than the due process clause as there is reason to believe it to be broader.

Both the due course[9] and the due process clauses are modern reaffirmations of the Magna Charta, ch. 39, in which King John promised, "No freeman shall be taken or imprisoned, or deseised, or outlawed, or banished, or any ways destroyed, nor will we pass upon him, nor will we send upon him, unless by the lawful judgment of his peers, or by the law of the land." MAGNA CHARTA ch. 39, *translated in* 3 VERNON'S ANNOTATED CONSTITUTION OF THE STATE OF TEXAS 624, 628

6. *See also Price v. City of Junction*, 711 F.2d 582, 590 (5th Cir.1983); *Moore v. Port Arthur Indep. Sch. Dist.*, 751 F.Supp. 671 (E.D.Tex.1990); *State v. Project Principle, Inc.*, 724 S.W.2d 387, 390–91 (Tex.1987); *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140–41 (Tex.1977); *Thompson v. Calvert*, 489 S.W.2d 95, 99 (Tex.1972); *House of Tobacco, Inc. v. Calvert*, 394 S.W.2d 654, 657–58 (Tex.1965); *Ex Parte Jimenez*, 159 Tex. 183, 317 S.W.2d 189, 194 (1958); *Steddum v. Kirby Lumber Co.*, 110 Tex. 513, 221 S.W. 920, 921 (1920); *Koy v. Schneider*, 110 Tex. 369, 221 S.W. 880, 890 (1920); *Mabee v. McDonald*, 107 Tex. 139, 175 S.W. 676, 678–681 (1915), *rev'd on other grounds*, 243 U.S. 90, 37 S.Ct. 343, 61 L.Ed. 608 (1917); *Lively v. Missouri, K & T Ry. Co.*, 102 Tex. 545, 120 S.W. 852, 856 (1909); *Long v. State*, 742 S.W.2d 302, 319–20 (Tex.Crim.App. 1987), *overruled in part on other grounds, Briggs v. State*, 789 S.W.2d 918, 923–24 (Tex.Crim.App. 1990); *Ex Parte Martinez*, 742 S.W.2d 289, 291 (Tex.Crim.App.1987); *Lindsay v. Papageorgiou*, 751 S.W.2d 544, 550 (Tex.App.—Houston [1st Dist.] 1988, writ denied); *Spelling v. State*, 719 S.W.2d 404, 409 (Tex.App.—Fort Worth 1986), *rev'd without opinion*, 770 S.W.2d 571 (Tex.Crim. App.1988) (per curiam); *Massachusetts Indem. & Life Ins. Co. v. Texas State Bd. of Ins.*, 685 S.W.2d 104, 113–114 (Tex.App.—Austin 1985, no writ). *See generally Lucas v. United States*, 757 S.W.2d 687, 711–14 (Tex.1988) (Phillips, C.J., dissenting) (examining due course cases in dissent and concluding that "Although an independent due course standard may have been applied by [the court of criminal appeals] on occasion, it is not firmly established in Texas jurisprudence. Because I find no sound policy justification for an

independent test ... I would defer to the federal standard in applying the Texas due course clause").

7. Although four exceptions to this rule have been identified, *see Lucas v. United States*, 757 S.W.2d 687, 713 (Tex.1988) (Phillips, J., dissenting), all four opinions are from the Texas Court of Criminal Appeals, which has not interpreted the clause consistently—even in the same year. *Compare Ex Parte Martinez*, 742 S.W.2d 289, 291 (Tex. Crim.App.1987) (clauses the same); *Smith v. State*, 683 S.W.2d 393, 399 n. 2 (Tex.Crim.App. 1984) (clauses the same), *with Ex Parte Cruz*, 739 S.W.2d 53, 61–63 (Tex.Crim.App.1987) (different); *Wright v. State*, 640 S.W.2d 265, 269 n. 12 (Tex.Crim.App.1982) (different).

8. One possible exception is the express protection in the Texas clause against disfranchisement.

9. The Texas Constitution contains not one but two "due course" clauses—art. I, § 19 and art. I, § 13. The § 13 due course clause, also known as the "open courts" provision, guarantees open courts to every citizen, and a remedy "for an injury done [them], in [their] lands, goods, person[s], or reputation[s] ... by due course of law." In contrast, the due course clause that protects against government infringement upon individual rights, art. I, § 19, prevents deprivation of rights, *"except by the* due course of *the law of the land."* (emphasis added). Art. I, § 13, does not mention liberty, privileges, or immunities.

(1983); *see also* THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 67–68 (George D. Braden ed., 1977). The Constitution of the Texas Republic read, "No person shall be deprived of privileges, outlawed, exiled, or in any manner disfranchised, except by due course of the law of the land." *Id.* Although the Magna Charta essentially protected against criminal punishment, by the time of the 1876 Texas Constitution, "due process" had come to hold a broader meaning as interpreted by the United States Supreme Court. *See Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 276–77, 15 L.Ed. 372 (1856); DAVID P. CURRIE, THE CONSTITUTION OF THE UNITED STATES: A PRIMER FOR THE PEOPLE 50 (1988). Nevertheless, in 1876 the Texas framers retained the Magna Charta language, "law of the land," transferred the prohibition against outlawry to article I, section 20, and retained the prohibition against disfranchisement. In addition, the Texas framers added "or immunities" to the protection of privileges—an apparent allusion to the Fourteenth Amendment.[10] Because they included selected Fourteenth Amendment language, the framers may have chosen to retain the Texas formulation, "due course of the law of the land," in lieu of "due process."[11] Since *"per legem terrae,"* or "by the law of the land," by the express terms of the Magna Charta, includes Acts of Parliament, *see* CURRIE, *supra* at 50–57; THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS, *supra* at 69, one could plausibly conclude that the Texas framers precluded all substantive due process by retaining "law of the land."

This approach is consistent with language this court employed to construe the due course clause shortly after the Texas Constitution was ratified:

> [I]t must be held that the people intended by that clause of the constitution, *in so far as it is identical* with the fourteenth amendment, to place thereby just such restrictions on the powers of the legislature as the highest court in the nation has declared is the true construction of *like language* made a part of the constitution of the United States for the purpose of placing limitation on the power of the several states.

*Mellinger*, 3 S.W. at 253 (emphasis added). *Mellinger*, of course, involved retroactivity of tax laws, and was not concerned with the issue of whether the due course clause includes a substantive component. It does not appear that this court has ever considered the possibility that "law of the land" may preclude substantive review of legislation, but rather has held that the due course clause is essentially identical to the due process clause. *Lucas v. United States*, 757 S.W.2d 687, 703 (Tex.1988) (Phillips, C.J., dissenting) (citing *Lively v. Missouri K. & T. Ry.*, 102 Tex. 545, 120 S.W. 852, 856 (1909); *Texas Optometry Bd. v. Lee Vision Center, Inc.*, 515 S.W.2d 380, 386 (Tex.Civ.App.—Eastland 1974, writ ref'd n.r.e.); Robert F. Williams, *Equality Guarantees in State Constitutional Law*, 63 TEX.L.REV. 1195, 1219 n. 160 (1965)).

Even if the Texas framers did not preclude substantive review of statutes under the due course clause, there are good reasons why the meaning of these clauses should be treated as being the same. First, the United States Supreme Court encounters due process issues far more frequently than does

10. By 1875 the federal privileges or immunities clause had been rendered "a practical nullity" in the *Slaughter–House Cases*, 83 U.S. (16 Wall.) 36, 71, 77–89, 21 L.Ed. 394 (1873).

11. During the 1875 Constitutional Convention, the Bill of Rights Committee proposed the following:

> No citizen of this state shall be deprived of life, liberty, property or privileges, or in any manner disfranchised, except by judgment of his peers, or the law of the land.

JOURNAL OF THE 1875 CONSTITUTIONAL CONVENTION 274 (1875). By amendment at the convention, the delegates added "or immunities," and retained the previous Texas reformulation of the Magna Charta language rather than restore the language of the Magna Charta verbatim. The changes seem to have been made with little debate or controversy. However, it remains clear that (1) the language of the Fourteenth Amendment was brought to the attention of the delegates during debate, (2) rather than proposing a shift in language closer to "due process," the Bill of Rights Committee proposed a return to the original language of the Magna Charta, and (3) the delegates chose to retain "law of the land."

this court, and thus is in a better position to develop a coherent and consistent framework. Second, because federal precedent in this area is more extensive than our state jurisprudence, the *Mellinger* approach promotes certainty in the law and discourages unnecessary or duplicative litigation. Third, the dangers of substantive due process going awry are great, and a restrained method minimizes the likelihood that arbitrary decisions will call this court's legitimacy into question. Finally, a restrained method enables our due course jurisprudence to evolve—to the extent it departs from the federal cases—with maximum deliberation and care. Simply put, unless differences between the clauses give us a good reason to depart from either the direct holdings of the Supreme Court or its methodology, then we should not do so.

In *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (plurality opinion), the Supreme Court rejected a due process challenge to a California statute that was more restrictive than the Texas statute at issue here. The only legally significant difference between *Michael H.* and this case is the putative father's ability to rely on an established relationship. Michael H. had developed a relationship with his daughter Victoria over several years, *see Michael H.*, 491 U.S. at 114–15, 109 S.Ct. at 2337–38, while Larry K., when he brought this paternity action under the Texas Family Code, acknowledged responsibility for child support, and "unsuccessfully attempted to [initiate] contact" with his child. 872 S.W.2d at 190. If Michael H's relationship did not give him the right to maintain his relationship, then surely Larry K.'s argument here carries even less weight. Unavoidably, then, the Supreme Court's decision in *Michael H.* is dispositive unless some difference between the due process and the due course clause mandates a different result.

The court of appeals acknowledged that its judgment, which this court affirms, is "in direct conflict with the ... Supreme Court's decision." 815 S.W.2d 863, 867. Nevertheless, this court claims that *Michael H.* is merely "useful in understanding" our essentially identical due course clause. 872

S.W.2d at 196. As its lodestar the court chooses a dissenting opinion by Justice Brennan, joined by two other justices, and an opinion by the Louisiana Supreme Court. *Id.* at 196 & 197.

All members of the Supreme Court in *Michael H.* agreed that a putative father who has not established a relationship with his child has no due process right to establish any relationship. *Michael H.*, 491 U.S. at 121–30, 109 S.Ct. at 2340–46 (Scalia, J., joined by Rehnquist, C.J., O'Connor & Kennedy, JJ.), 132–33 (Stevens, J., concurring), 142–43 (Brennan, J., joined by Marshall & Blackmun, JJ.), 159–61 (White, J., joined by Brennan, J.). Justice Stevens concurred with the four-judge plurality opinion by Justice Scalia on the ground that Michael H. had no constitutional right to a declaration of paternity, *id.* at 132–33, 109 S.Ct. at 2346–47, but noted that the California statutory scheme still provided Michael H. an opportunity to sue as "any other person" to maintain his established relationship with Victoria. *Id.* at 133–36, 109 S.Ct. at 2347–49. Justice Stevens did not decide whether an established relationship results in a protected right, but "assume[d] for the purpose of deciding this case" that such a right existed between Michael H. and Victoria. *Id.* at 136, 109 S.Ct. at 2348. Presumably, even Justice Brennan would hold that Larry K. does not have a right to sue for paternity. Thus, there are no "sharp divisions," *see* 872 S.W.2d at 196, among the justices concerning the issue presented in this case.

If this court could identify some difference between the due course and due process clauses, some other clause in the Texas Constitution, some aspect of history or a tradition unique to Texas to demonstrate that the Texas Constitution confers an authority to intervene in this case when the United States Constitution does not, then the court's conclusion might be supportable. But the court does not identify even a relevant difference, let alone a compelling one. I do not suggest that this court should never look to the Texas Constitution to determine whether the rights it provides are different from the rights guaranteed under an analogous provision of the United States Constitution. My concern

is that the court's dramatic departure from our usual interpretive framework undermines this court's legitimacy.

## IV. Substantive Due Process

What the court describes as the source of its power to hold these statutes unconstitutional is the doctrine of substantive due process. Although the court of appeals was candid enough to say so, 815 S.W.2d at 866–67, this court seems coy about it. Only JUSTICE ENOCH'S dissenting opinion directly identifies the basis for the court's holding. 872 S.W.2d 200.

Although the court at one point claims to establish merely a procedural "right to be heard," 872 S.W.2d at 196, it elsewhere admits the issue at stake involves substantive "parental rights" to "establish a relationship," *id.* at 190, 195, n. 17, including visitation and custody rights. *Id.* at 191. The plurality in *Michael H.* correctly pointed out that one may not change a substantive due process case into a procedural case simply by characterizing a substantive rule of law as a procedural "presumption," 491 U.S. at 119–21, 109 S.Ct. at 2339–41; *see also id.* at 132–33, 109 S.Ct. at 2346–47 (Stevens, J., concurring). Other decisions also highlight this essential distinction.

For example, in *New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), Justice Brennan writing for the Court rejected General Motors' argument that it was denied a procedural right to a hearing under a California statute governing dealership licensing that prevented General Motors from placing a dealership in the "market area" of an existing franchisee absent a waiver from the licensing board. Justice Brennan wrote, "[The statute] does [not] restrain appellee General Motors from exercising any right that it had previously enjoyed.... It was the Act, not the Board's notice that curtailed General Motors' right to franchise at will." *Id.* at 104–05, 99 S.Ct. at 409. Justice Brennan identified the issue as one of substantive due process, despite the claims concerning a procedural right to "a hearing." *Id.* at 99, 122, 99

S.Ct. at 406, 418. Yet he took the opposite position in his *Michael H.* dissent. *Michael H.*, 491 U.S. at 136, 109 S.Ct. at 2348 (Brennan, J., dissenting).

A proper analysis would not assume that Larry has a right to establish paternity, but rather would ask (1) is there a pre-existing substantive right, if so, (2) what is the nature of this right, and (3) are there any countervailing state interests that would permit the state to terminate the biological father's right when there is a presumed father? Procedural questions arise only after identification of a relevant constitutional right and any countervailing state interests. In this way the focus is more likely to remain on whether the statute itself is valid, rather than on how we would weigh the rights and interests of affected persons were we writing the statute ourselves. Larry K.'s parental rights are a question of substantive law, and the court must analyze the competing interests at stake before it can determine whether the statutory procedures are adequate. *See generally Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (analyzing prison medication policy on both substantive and procedural grounds); *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 194–97, 109 S.Ct. 998, 1002–04, 103 L.Ed.2d 249 (1989) (due process right does not require state to provide services or benefits absent an "entitlement" or custodial relationship); *Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 222–28, 106 S.Ct. 507, 511–15, 88 L.Ed.2d 523 (1985) (characterizing medical student's asserted due process right to retake examination as "substantive"); *Stanley v. Illinois*, 405 U.S. 645, 650–52, 92 S.Ct. 1208, 1211–13, 31 L.Ed.2d 551 (1972) (holding biological father's rights subject to both substantive due process and equal protection analysis).

In *Michael H.* the Court expressed grave concerns about the apparently limitless nature of substantive due process. Expanding the due process clause to include substantive rights not mentioned in the text of the Constitution, the Court said,

has been a treacherous field for this Court, giving reason for concern lest the only limits to ... judicial intervention become

the predilections of those who happen to be Members of this Court.... [because] [t]he judiciary, including this Court, is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution.

491 U.S. at 121, 109 S.Ct. at 2341 (quoting *Moore v. City of East Cleveland,* 431 U.S. 494, 502, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977)); *see also Collins v. City of Harker Heights,* —— U.S. ——, ——, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992) ("[T]he Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended.") Judicial resort to substantive due process has been principally criticized as an extra-constitutional means by which judges impose their value preferences on society. *Id.*

The most notorious early application of the doctrine by the United States Supreme Court was *Dred Scott v. Sandford,* 60 U.S. (19 How.) 393, 450–52, 15 L.Ed. 691 (1857), in which Chief Justice Roger Taney concluded that (1) slave-owners were entitled to protection under the Fifth Amendment for the property rights they held in their slaves, *id.* at 451–52, and (2) the Missouri Compromise was unconstitutional because it deprived slave-owners of "property" without due process when they transported slaves across state lines. *Id.* at 450, 452; *see also* JOHN HART ELY, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW 16 (1980); JAMES W. ELY, JR., THE GUARDIAN OF EVERY OTHER RIGHT: A CONSTITUTIONAL HISTORY OF PROPERTY RIGHTS 79 (1992). The Court's decision drew a fiery dissent from Justice Curtis:

When a strict interpretation of the Constitution, according to the fixed rules which govern the interpretation of laws, is abandoned, and the theoretical opinions of individuals are allowed to control its meaning, we have no longer a Constitution; we are under the government of individual men, who for the time being have the power to declare what the constitution is, according to their own view of what it ought to mean.

*Dred Scott,* 60 U.S. (19 How.) at 621 (Curtis, J., dissenting).

Around the turn of the century judges found substantive due process useful for stifling labor law reform and other progressive legislation. KERMIT L. HALL, WILLIAM M. WIECK, & PAUL FINKELMAN, AMERICAN LEGAL HISTORY, CASES AND MATERIALS 367–8, 388 (1991); LAWRENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 567–74 (2d ed. 1988); *see, e.g., Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), *overruled by West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937); *Coppage v. Kansas,* 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441 (1915), *overruled by NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); *Adkins v. Children's Hosp.,* 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923), *overruled by West Coast Hotel Co.,* 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937); *see also Hammer v. Dagenhart,* 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918), *overruled by United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941).

After the demise of *Lochner* and it progeny, substantive due process did not vanish entirely, but its use was sharply curtailed. TRIBE, *supra* at 574–86. In an effort to minimize the doctrine's inherent arbitrariness, the Supreme Court has developed a rigorous analytical framework for its application:

The inescapable fact is that adjudication of substantive due process claims [calls] upon the Court in interpreting the Constitution to exercise ... reasoned judgment. Its boundaries are not susceptible of expression of a simple rule. That does not mean we are free to invalidate policy choices with which we disagree; yet neither does it permit us to shrink from the duties of our office.

*Planned Parenthood v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2806, 120 L.Ed.2d 674 (1992).

The Court generally employs a "rational basis" analysis in substantive due process cases. That is, even if a statute interferes with an identified constitutional right, the Court will not strike it down unless it bears

no rational relation to any legitimate government interest. *United States v. Carolene Prods. Co.*, 304 U.S. 144, 148–53, 58 S.Ct. 778, 781–84, 82 L.Ed. 1234 (1938). Under the rational basis test, the Court will uphold a law even for hypothetical reasons if "it might be thought that the particular legislative measure was a rational way to correct some problem" the legislature might have identified. *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955).

The Court departs from this generous test when a fundamental right is at stake. *Carey v. Population Servs. Int'l*, 431 U.S. 678, 685–86, 97 S.Ct. 2010, 2016–17, 52 L.Ed.2d 675 (1977). However, simply because a fundamental right is at stake "does not ... automatically invalidate every state regulation ... even a burdensome regulation may be validated by a sufficiently compelling state interest." *Id.* Under a strict scrutiny analysis, however, the statute must be "narrowly tailored" and "necessary" to achieve that compelling interest. *Roe v. Wade*, 410 U.S. 113, 155–56, 93 S.Ct. 705, 727–28, 35 L.Ed.2d 147 (1973); *Casey*, — U.S. at ——, 112 S.Ct. at 2847 (Blackmun, J., concurring).

When identifying fundamental rights, the Supreme Court has applied an exacting historical and textual analysis. The most familiar of the substantive liberties protected by the Fourteenth Amendment are those recognized by the Bill of Rights. *Casey*, — U.S. at ——, 112 S.Ct. at 2804. However, the Court has not incorporated into the Fourteenth Amendment (and thus applied to the states) all rights recognized in the Bill of Rights, but only those rights "so rooted in the tradition and conscience of our people as to be ranked as fundamental" and thus "implicit in the concept of ordered liberty." *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937) (Cardozo, J.).

When extending substantive due process rights beyond those found in the express language of the Bill of Rights,[12] the Court has consistently identified a basis for the extension in the language and history of the Constitution. For example, in *NAACP v. Alabama*, 357 U.S. 449, 460–66, 78 S.Ct. 1163, 1170–74, 2 L.Ed.2d 1488 (1958), the Court identified a fundamental right of association in the First and Fourteenth amendments not expressly mentioned in the constitutional text. In *Griswold v. Connecticut*, 381 U.S. 479, 482–85, 85 S.Ct. 1678, 1680–82, 14 L.Ed.2d 510 (1965), the Court identified a "zone of privacy created by several fundamental constitutional guarantees," including the First Amendment rights of assembly, association, speech, and the press, the Third Amendment right against quartering, the Fourth Amendment right to be free from searches and seizures, the self-incrimination clause of the Fifth Amendment, and the Ninth Amendment. *See also Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399–403, 43 S.Ct. 625, 626–28, 67 L.Ed. 1042 (1923). Recent cases have also focused on the history and text as the primary restraints on the discretion of courts when they analyze cases under the due process clause.[13] *See, e.g., Casey,*

12. "It is tempting, as a means of curbing the discretion of ... judges, to suppose that liberty encompasses no more than those rights already guaranteed ... by the express provisions of the first eight amendments ... [b]ut of course [the] Court has never adopted that view." *Casey*, — U.S. at —— ——, 112 S.Ct. at 2804–05.

13. Although in the application of historical analysis "it is tempting ... to suppose that the Due Process Clause protects only those practices ... that were protected against government interference ... when the Fourteenth Amendment was ratified," such a view "is inconsistent with our law." *Casey*, — U.S. at ——, 112 S.Ct. at 2805; *Id.* — U.S. at ——, 112 S.Ct. at 2874 (Scalia, J., dissenting) ("That is not, however what *Michael*

*H.* says; it merely observes that in defining 'liberty,' we may not disregard a specific, 'relevant tradition protecting, or denying protection to, the asserted right' "). Rather, the rule is one of "reasoned judgment," *id.* — U.S. at ——, 112 S.Ct. at 2806, which does not "foreclose the unanticipated by the prior imposition of [this] form of historical analysis." *Michael H.*, 491 U.S. at 132, 109 S.Ct. at 2346 (O'Connor, J., concurring). Although this constitutional tradition is "a living thing," it must however "[have] regard for what history teaches are the traditions from which it developed as well as the traditions from which it broke." *Casey*, — U.S. at ——, 112 S.Ct. at 2806 (quoting *Poe v. Ullman*, 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting from dismissal

— U.S. at ——, 112 S.Ct. at 2805; *Michael H.*, 491 U.S. at 132, 109 S.Ct. at 2346.

## V. Applying the Framework to the Facts

In *Planned Parenthood v. Casey*, the Court criticized the historical analysis of the *Michael H.* plurality. But while all justices on the Court appear to agree that a man in Larry K.'s position has no right to sue for paternity under the due process clause, a re-evaluation of the Supreme Court due process cases as they apply to family relationships for purposes of confirming the *Michael H.* holding is indicated. This re-examination reveals that this court's analysis is fundamentally flawed.

In *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court struck down a law that denied an unmarried man custody over his children upon the death of their mother. Although Stanley had lived with the children's mother for years and helped to support them, his only option for retaining custody under Illinois law was to sue for adoption. *Id.* at 646–48, 92 S.Ct. at 1210–11. Citing *Levy v. Louisiana*, 391 U.S. 68, 71–72, 88 S.Ct. 1509, 1511, 20 L.Ed.2d 436 (1968), the Court wrote that it would "recognize those family relationships unlegitimized by a marriage ceremony." *Stanley*, 405 U.S. at 651, 92 S.Ct. at 1213. The Court held that Stanley's established relationship with his children gave rise to a nonfundamental, "cognizable and substantial" due process right. *Id.* at 652, 92 S.Ct. at 1213. Applying a rational relationship test, the Court held, "The state's interest . . . is de minimis if Stanley is shown to be a fit father. . . . Under the Due Process Clause [the efficiency of a presumption] is insufficient to justify refusing . . . a hearing when the issue at stake is the dismemberment of [Stanley's] family." *Id.* at 657–58, 92 S.Ct. at 1216.

Later, in *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), a biological father sued to block the adoption of his child by the mother's husband. The mother was not married at the time the child was born. The biological father filed filiation papers only after the adoption proceeding had commenced. Comparing the case to *Stanley*, a unanimous Court recognized that "the countervailing interests" of the married family "are more substantial." *Id.* at 248, 98 S.Ct. at 551. Although the child had expressed at a hearing a desire to continue visiting the biological father, the statute divested the biological father of all parental rights, including visitation. *Id.* at 251 n. 11, 98 S.Ct. at 553. Noting that "the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except [the biological father]," the Court held that the statute satisfied the due process clause. *Id.* at 255, 98 S.Ct. at 555. In a situation in which the child was born out of wedlock, the biological father's right could only be denied following a hearing and determination of "the best interests of the child." *Id.* at 255, 98 S.Ct. at 555.

The statute at issue in *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), also involved paternal consent to the adoption of a child born out of wedlock. Although the Court held the statute unconstitutional on equal protection grounds because it involved impermissible gender discrimination, the Court did not identify any due process right in the father entitling him to more than intermediate-level scrutiny. *See Caban*, 441 U.S. at 391, 99 S.Ct. at 1767 (citing *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920)). The court expressly distinguished between infant adoptions and the adoption of two children who had lived with their father for years. *Id.* 441 U.S. at 389–90, 99 S.Ct. at 1766–67. While a statute that provided for only maternal consent in the former case would be substantially related to an important government interest, the same statute in the latter case would not. *Id.*

Finally, in *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the

on jurisdictional grounds)). It "certainly [is] not one where judges [are] free to roam where unguided speculation might take them." *Id.*

Court rejected a biological father's claim that he had an absolute right to notice and a hearing before his child could be adopted. Because the father had not signed a "putative father registry" or provided child support, and was not within any of the classes of persons who were entitled to notice, the Court held he was not entitled to any more notice than provided in the statute. Noting that "[p]arental rights do not spring full-blown from the biological connection between parent and child," *id.* at 260, 103 S.Ct. at 2992 (citing *Caban*, 441 U.S. at 397, 99 S.Ct. at 1770), the Court suggested that a biological father's right to constitutional protection increases with the strength of his relationship and as· the father "come[s] forward to participate in the rearing of his child." *Id.* 463 U.S. at 261, 103 S.Ct. at 2993 (citing *Caban*, 441 U.S. at 392, 99 S.Ct. at 1768). The Court also emphasized that the Constitution provides protection for "formal family relationships," stating:

> The institution of marriage has played a critical role both in defining the legal entitlements of family members and in developing the decentralized structure of our democratic society.... In some cases, however, this Court has held that the Federal Constitution supersedes state law and provides even greater protection for formal family relationships.... [T]he court has found that the relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection. *See also Moore v. City of East Cleveland,* 431 U.S. 494 [97 S.Ct. 1932, 52 L.Ed.2d 531] (1977). State intervention to terminate such a relationship must be accomplished by procedures meeting the requisites of the Due Process Clause. *Santosky v. Kramer,* 455 U.S. 745 [102 S.Ct. 1388, 71 L.Ed.2d 599] (1982).

*Lehr,* 463 U.S. at 256–58, 103 S.Ct. at 2990–92.

Although no case until *Michael H.* addressed a child born to a married couple, the pre-*Michael H.* cases when read together with *Michael H.* reveal several things: (1) that the highest level of constitutional protection an unwed father may claim is intermediate-level scrutiny, and only if he has a developed relationship with his offspring that is terminated as a result of a gender-based classification,[14] *see Caban,* 441 U.S. at 391, 99 S.Ct. at 1767, (2) biology alone establishes the most minimal of due process rights, *see Lehr,* 463 U.S. at 260–61, 103 S.Ct. at 2992–93, and does not entitle the father even to actual notice, let alone a right to a hearing, *see id.* at 264–65, 103 S.Ct. at 2994–95, (3) under other circumstances, the importance of the father's right is measured on a sliding scale and depends on the totality of the circumstances, *see id.* at 258–62, 103 S.Ct. at 2991–94; *Caban,* 441 U.S. at 392, 99 S.Ct. at 1768, and (4) a marital relationship between the woman and the adoptive or presumed father is entitled to constitutional protection, and its existence reduces the level of protection afforded the biological father. *See Quilloin,* 434 U.S. at 248, 98 S.Ct. at 551; *Lehr,* 463 U.S. at 256–58, 103 S.Ct. at 2990–92.

Although the standard due process framework channels analysis into either a "rational basis" or "strict scrutiny" framework, the complexity of human relationships at issue in family law cases has yielded a more flexible sliding-scale analysis. Under the current Supreme Court analytic framework, the importance of the parental or familial right must first be identified, taking due account of the due process rights of others, and a biological father's right is subject to regulation if the countervailing state interest is sufficiently important. *Caban,* 441 U.S. at 391, 99 S.Ct. at 1767; *Carey,* 431 U.S. at 685–86, 97 S.Ct. at 2016–17; *F.S. Royster Guano Co.,* 253 U.S. at 415, 40 S.Ct. at 561. Only statutes affecting traditional marital families or lineal relatives living voluntarily as a family unit have been subject to strict judicial scrutiny.

14. Notably, no such gender classification could exist under the Texas statute. If a married man were to live with an unmarried woman, and they conceived a child before he returned to his wife, the child would not be born to a married couple. As the child would be born out of wedlock, the state has no apparent purpose in preventing a paternity suit because the man's wife would not under any circumstances be the child's presumed parent. Nevertheless, the court at one point elects to segue into what appears to be an equal protection argument when it charges "[g]ender is the preeminent consideration for Justice Cornyn." 872 S.W.2d at 195, n. 17. As should be apparent, my preeminent concern is for the rights of Texas children and families.

*See Pierce,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Prince v. Massachusetts,* 321 U.S. 804, 64 S.Ct. 784, 88 L.Ed. 1090 (1944); *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Carey,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion) (level of scrutiny indeterminate for voluntary family of lineal relatives).

The factors that must be considered in determining the importance of the putative father's right include (1) the presence of a biological connection, (2) the duration and quality of the relationship that has actually developed,[15] (3) the putative father's efforts to fulfill the obligations of fatherhood, and (4) the presence of countervailing family interests, particularly when the child is born to a traditional family. Here, no relationship has actually developed. Although Larry K. has indicated his willingness to assume parental responsibilities and has demonstrated a biological connection, these factors are offset by what I would hold are the "more substantial" countervailing due process rights of the family. *See Quilloin,* 434 U.S. at 248, 98 S.Ct. at 551. Under the circumstances, Larry K. is entitled to no scrutiny more searching than the rational basis test. *Quilloin,* 434 U.S. at 254–55, 98 S.Ct. at 554–55; *Lehr,* 463 U.S. at 265, 103 S.Ct. at 2995; *Michael H.,* 491 U.S. at 123–30, 109 S.Ct. at 2341–46. Therefore the statute is constitutionally valid if the state interests at stake are legitimate, and the statute is related to them in a rational manner.

Among the state interests the statute can be said to advance are promoting "certainty and stability" in the lives of children, 872 S.W.2d at 194, advancing "the best interests" of the child, *id.* at 197, and "minimizing familial disruptions that are harmful to the child." *Id.* at 197. The legislature certainly could conclude that best interests of children born

to married couples are better served if paternity and its associated litigation by outsiders, even biological fathers, is barred altogether.

Not only does the statute appear rationally related to the state's interest in protecting children, it also promotes the state's interest in protecting families in general—an interest apart from any particular family's right to be free from government interference. The legislature could reasonably determine that litigation over paternity and visitation would prove so disruptive and so rarely produce any satisfactory outcome that all such lawsuits should be barred. Even if the court is correct that Larry K. has a Texas constitutional right entitled to recognition, the state has legitimate and significant reasons to prohibit paternity lawsuits altogether when a marital family is involved.

There is another defect in the court's approach: The court's creation of a general right of putative fathers to demand paternity tests may itself violate due process. Traditional marital families are entitled to heightened due process protection against intrusive state action. *Pierce,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Prince,* 321 U.S. 804, 64 S.Ct. 784, 88 L.Ed. 1090 (1944); *Boddie,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Loving,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). J.W.T. is also entitled to due process protection before the state may interfere with his physical integrity. *See Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (holding that stomach pumping to obtain criminal evidence violates due process); *Breithaupt v. Abram,* 352 U.S. 432, 435–40, 77 S.Ct. 408, 410–13, 1 L.Ed.2d 448 (1957) (applying *Rochin v. California* standard to blood alcohol test administered incident to arrest).

Nevertheless, by exercising the constitutional right the court has identified today, Larry can employ the power of the state to compel the sampling of J.W.T.'s blood after showing "serious and continuous efforts" to

---

15. *See Lehr,* 463 U.S. at 261, 103 S.Ct. at 2993 ("The difference between the developed parent-child relationship that was implicated in *Stanley* and *Caban,* and the potential relationship involved in *Quilloin* and this case, is both clear and significant.").

exercise his parental responsibilities. 872 S.W.2d at 191, n. 5; *see also,* TEX.FAM.CODE ANN. § 13.02 ("When the respondent appears in a paternity suit, the court *shall* order the mother, the alleged father, and child to submit to the taking of blood.") (emphasis added). Then, if the tests are 99% positive, the court must shift the burden of proof against the family, thus imposing a statutory presumption of paternity *against the protected marital family.* TEX.FAM.CODE ANN. § 13.05. Assuming the marital family will be unable to rebut this "scientific fact," Larry K. will be entitled to "create the parent-child relationship ... for all purposes" with J.W.T. *See* TEX.FAM.CODE ANN. § 13.09. While the results of the blood test may have substantial impact on the child's legal status, including issues relating to inheritance and right to financial support, the court provides for *no hearing* in advance of testing to determine whether the blood test itself is in the "best interest·of the child." If a "best interest" hearing in advance of state action substantially affecting a developed relationship between an unmarried father and his children is constitutionally required, *see Stanley,* 405 U.S. at 658, 92 S.Ct. at 1216, then a marital family certainly should be entitled to a "best interest" hearing before someone outside the family may harness the power of the state to compel action that will create a presumption disrupting the family unit. If a child born to a married couple is not the child of the husband, but the couple nevertheless assumes full responsibility for the child and develops a relationship, then the family has a right under the United States Constitution not to have that paternity challenged. The court's judgment takes no cognizance of and violates that right.

## VI.   The Court's "Adaptability" Analysis

The court's "adaptability" analysis is a conclusory exercise. Whenever the court wants to adapt the constitution, it can simply recite the incantation, "We have recognized the adaptability to such changes of our state's governing law and found considerable strength in the organic nature of its command," and amend accordingly. 872 S.W.2d at 194. This methodology allows the Texas Constitution to become "adaptable" any time five members of this court so desire.

The court's justification in this case is an apt illustration: (a) the Texas Constitution is "adaptable," (b) prior decisions have accorded "great respect" for the biological bond between parent and child, (c) therefore, this biological bond assumes fundamental constitutional status, rendering any legislative qualification of the right void.[16] *Id.* When the court goes on to require Larry K. to make "serious and continuous efforts," however, the court balances his rights against the very conflicting interests it forbids the legislature from balancing—the father's "interest in establishing a relationship," the "public interest in protecting the child," and the "public interest in securing stable homes and supportive families for children." *Id.* at 195.

The court bases its decision on "[s]ignificant twentieth century changes in the resolution of issues affecting the family." 872 S.W.2d at 193. The changes cited include *statutory* changes authorizing paternity actions, advances in science that permit easier proof of biological paternity, an increase in divorce, single parent families, and out-of-wedlock births, and the social stigma attached to illegitimacy. None of these changes creates new rights under the Texas Constitution.

First, removal of the term "illegitimacy," from the Family Code does not mean that such status is no longer stigmatizing. Unless the term were objectionable to some, there

16. The court suggests that the constitutional right of biological fathers may still be qualified by the legislature in cases of adoption. 872 S.W.2d at 198, n. 26. However, the court does not explain why this right may be qualified by the rights of families in one context, yet not in another. The court also misses the point when it argues "[a]n examination of the Family Code indicates that our decision does not jeopardize the adoption process." *Id.* The Family Code will keep adoptive families out of jeopardy only so long as the court is not willing to strike its provisions down on constitutional grounds. The reason this case places the adoption process in jeopardy is that seven judges today announce their willingness to employ the Texas Constitution against the Family Code whenever they dislike the result the Family Code produces.

would be no reason to remove it. Next, simply because proof of paternity is easier does not mean that blood tests should be the sole, or even a primary, determinant of parenthood. Rather, our adoption laws clearly indicate that parenthood is a legal status that may develop with or without a biological connection. "Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." *Lehr,* 463 U.S. at 261, 103 S.Ct. at 2993 (emphasis omitted).

The presumption of paternity originally prevented proof *by the married parents* of a child that the child was not a product of the marriage. *Goodnight v. Moss,* 98 Eng.Rep. 1257, 1258 (K.B. 1777). Technological advances allowing greater accuracy in establishing paternity may have influenced the legislature's decision to permit *married parents* to challenge the paternity of their own children. However, the legislature did not abrogate the marital presumption entirely, but only with respect to the *married parents* themselves. *See* Act of Sept. 1, 1983, 68th Leg., R.S., ch. 424 § 7, 1983 Tex.Gen.Laws 2355. Simply because the policy reasons favoring a presumption against married parents no longer exist does not mean that policies such as protecting families and preserving the best interests of children do not

favor a presumption that applies selectively against outsiders. Therefore, the court's proffered justifications bear no relation to the change the court makes in the law.

The legislature amended these same statutes as recently as 1989. As we have said repeatedly when assessing the constitutionality of statutes, the wisdom and expediency of the law is the legislature's sole prerogative. *See, e.g., Vinson v. Burgess,* 773 S.W.2d 263, 266 (Tex.1989). We have a clear duty to uphold statutes even if they produce a policy of which we disapprove. *See, e.g., Tijerina v. City of Tyler,* 846 S.W.2d 825, 828 (Tex.1992) (Doggett, J.). If the social goals upon which the court relies are indeed "emerging," it is up to the people of Texas, not this court, to make them law.

Moreover, the court's allegedly dramatic social "trends" are nothing more than a snapshot from last year's STATISTICAL ABSTRACT OF THE UNITED STATES. The history and demography of divorce, single parenting, and out-of-wedlock births are remarkably complicated,[17] and are subject to considerable debate inside and outside academia.[18] None of these phenomena are new, and statistical rates of increase or decrease are subject to manipulation.[19] Indeed, others examining

---

**17.** *See* Barbara Brookes, *Women and Reproduction, 1860–1939, in* LABOUR AND LOVE: WOMENS' EXPERIENCE OF HOME AND FAMILY 1850–1940 149–71 (Jane Lewis, ed. 1986); LAWRENCE STONE, UNCERTAIN UNIONS: MARRIAGE IN ENGLAND 1660–1753· 3–32 (1992); LAWRENCE STONE, ROAD TO DIVORCE· ENGLAND 1530–1987 1–45, 121–228, 347–416 (1990) [hereinafter ROAD TO DIVORCE]; LAWRENCE STONE, THE FAMILY, SEX, AND MARRIAGE IN ENGLAND 1500–1800 (1977) [hereinafter FAMILY, SEX, AND MARRIAGE]; ANTONIA FRASER, THE WEAKER VESSEL· WOMENS' LIVES IN SEVENTEENTH CENTURY ENGLAND (1987); STATISTICAL HANDBOOK ON THE AMERICAN FAMILY 119 (Bruce A. Chadwick & Tim B. Heaton, eds. 1992); *see generally* David Goetz, *Researcher Tries to Pin Down Name of Lincoln's Grandfather,* U.S.A. TODAY, April 29, 1993; *Be Unwed and Multiply,* THE ECONOMIST June 16, 1984, at 50; STEPHANIE COONTZ, THE WAY WE NEVER WERE· AMERICAN FAMILIES AND THE NOSTALGIA TRAP 8–41, 91–121, 207–54 (1992); Herbert L. Smith, Jr. & Phillips Cutright, *Thinking About Change in Illegitimacy Ratios: United States, 1963–1983,* 25 DEMOGRAPHY 235 (1988); Phillips Cutright & Herbert L. Smith, *Trends in Illegitimacy Among Five English–Speaking Populations: 1940–1980,* 23 DEMOGRAPHY 563 (1986); Leah Leneman & Rosalind Mitchison, *Scottish*

*Illegitimacy Ratios in the Early Modern Period,* 40 THE ECONOMIC HISTORY REV. 41 (1987).

**18.** *Compare* ROAD TO DIVORCE, FAMILY, SEX, AND MARRIAGE, *with* FERDINAND MOUNT, THE SUBVERSIVE FAMILY: AN ALTERNATIVE HISTORY OF LOVE AND MARRIAGE 15–92, 153–259 (1982); *see also* Barbara Dafoe Whitehead, *Dan Quayle Was Right,* THE ATLANTIC, April 1993 at 479; Samuel Francis, *Inchoate Cultural Numbers Game,* WASHINGTON TIMES Mar. 23, 1993, at F3; Paul Greenberg, *The Trouble With Us: Maybe Its Not the Economy, Stupid,* CHICAGO TRIBUNE Apr. 23, 1993, at Perspective 23; Martin Walker, *American Diary,* THE GUARDIAN, May 24, 1993, at Features 18.

**19.** *See generally supra* note 17. For example, one recent study, EMPOWER AMERICA & THE HERITAGE FOUNDATION, INDEX OF LEADING CULTURAL INDICATORS (William Bennett, ed. 1993), selects 1960 as its baseline year for several statistics. Not coincidentally the United States in 1960 had emerged from a decade of phenomenal prosperity. While United States citizens represented 5.98 percent of the 1960 world population, UNITED NATIONS, WORLD POPULATION PROSPECTS: THE 1992 REVISION at 148, 160, U.N. Doc. ST/ESA/SER.A/135, U.N.

the issue have reached conclusions diametrically opposed to those the court reaches.[20]

Finally, courts are uniquely unsuited to resort to such "legislative facts" in reaching social policy decisions.[21] Especially when the information the court relies on is not subject to cross-examination, is not subject to challenge by an opposing party through the introduction of contradictory data, and is the product of limited internal research for the purpose of bolstering a conclusion already reached, sound decisions cannot be expected. It is therefore difficult to see how the court's suppositions render sections of the Family Code unconstitutional, particularly when the legislature had access to demographic and scientific information at least as reliable and

Sales No. E.93.XIII.7 (1993), United Nations statistics from 1953 show that the United States was responsible for 51.68 percent of the worldwide value added in mined and manufactured (non-agricultural) goods. 1960 U.N.Stat.Y.B. 70, U.N. Sales No. 61.XVII.1. In contrast, the United States in 1990 represented 4.72 percent of the world population, WORLD POPULATION PROSPECTS, *supra* at 148, 160, and the United States gross domestic product had risen to between 25.59 and 27.46 percent of gross world product, depending on measurement methodology, from a low in 1980 of between 23.20 and 26.79 percent of gross world product. UNITED NATIONS, TRENDS IN INTERNATIONAL DISTRIBUTION OF GROSS WORLD PRODUCT at 225, U.N. Doc. ST/ESA/SER.X/18, U.N. Sales No. E.92.XVII.7 (1993). Other writers have described the decrease in illegitimacy that accompanied industrialization and rising standards of living:

> Giving birth was an experience shared by the majority of women in the years from 1860 to 1939 and, increasingly, this experience took place within marriage. As "illegitimate" births declined in the late nineteenth century, formal marriage became more entrenched as a necessary precondition to the bearing and raising of children.

Barbara Brookes, *Women and Reproduction, 1860–1939, in* LABOUR AND LOVE: WOMENS' EXPERIENCE OF HOME AND FAMILY 1850–1940 149–167 (Jane Lewis, ed. 1986).

However, rising levels of relative material prosperity are not the sole, or even the predominant factor affecting illegitimacy rates. For example, while the relative state of the United States economy improved in the period between 1980 and 1990, this period was accompanied by a dramatic increase in illegitimacy. One study, focusing on the United States, found that illegitimacy among whites increased 75 percent in the period between 1963 and 1983, but most of the statistical increase occurred during the last five years of the time frame. Herbert L. Smith, Jr. & Phillips Cutright, *Thinking About Change in Illegitimacy Ratios: United States, 1963–1983,* 25 DEMOGRAPHY 235 (1988). Adolescent fertility statistics covering all United States women between the ages of 15 and 19 also indicate a recent rapid increase in illegitimacy. The overall birthrate for American adolescents declined from 89.1 annual births per 1000 women in 1960 to 51.1 births per 1000 in 1987. STATISTICAL HANDBOOK OF THE AMERICAN FAMILY, *supra* at 122. While birthrates have declined overall, illegitimacy has ris-

en, particularly in recent years. In 1960, 148 adolescent births in 1000 were out of wedlock, but this increased to 476 per 1000 in the twenty years from 1960 to 1980. *Id.* However, in just seven years between 1980 and 1987, the rate jumped from 476 per 1000 to 619 per 1000. *Id.* In other words, well over half of teenage births today are out of wedlock. To the extent these statistics indicate a social trend, it would appear the recent explosion in illegitimate births may be cause for alarm rather than celebration at the emergence of new social goals or the triumph of science in promoting "certainty and stability."

**20.** Several other commentators, with a broad range of political views, have examined the identical social statistics and concluded that increased family stability would be beneficial for American society. *See Whitehead, supra;* Cal Thomas, *The Public Schools to Which our Children are Going,* THE TIMES-PICAYUNE, Sep. 10, 1993, at B7; *Ex-Education Secretary Sees Sickness of Soul,* L.A. TIMES Sep. 4, 1993 at B5; David Broder, *Messages Bear out Quayle's Warning: The American Family is Threatened,* HOUSTON CHRONICLE, Mar. 29, 1993, at A15 (describing "interesting convergences" between William Bennett and Sen. Bill Bradley at a seminar on the family sponsored by David Gergen); *How to Reverse the Fall of "Cultural Indicators",* PHOENIX GAZETTE, May 31, 1993, at Perspective 3; Willie Richardson & Guenevere Daye Richardson, *Single Parenthood Impoverishes Black Children,* HOUSTON CHRONICLE, July 22, 1993, at A5. These commentators are cited to demonstrate that views differ widely concerning these issues, not to adopt a particular position.

**21.** *See* Peggy C. Davis, *"There is a Book about . . .": An Analysis of Judicial Absorption of Legislative Facts,* 100 HARV.L.REV. 1539, 1541 (1987) ("The absence of traditions and procedures for regulating judicial notice of legislative facts provides the sitting judge with a dangerous freedom."); Arthur S. Miller & Jerome A. Barron, *The Supreme Court, The Adversary System, and the Flow of Information to the Justices: A Preliminary Inquiry,* 61 VA.L.REV. 1187, 1235 n. 121 (1975) ("Given the inherent limitations (and frequent unreliability) of social science data some adequate process for challenge is essential. . . . Worst of all is where the Court comes up with the data based on its own research and counsel have no opportunity to challenge it.").

possibly more sophisticated than the information upon which the court relies.

## VII. State Constitutionalism and the New Federalism

This is not the first time this court has accepted the invitation of former Justice William Brennan to read into our state constitution "rights" that the Supreme Court has declined to recognize in the United States Constitution. *See Davenport v. Garcia*, 834 S.W.2d 4, 12 n. 23, 20 n. 53 (Tex.1992) (*citing* William J. Brennan, Jr., *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights*, 61 N.Y.U.L.REV. 535 (1986); William J. Brennan, Jr., *State Constitutions and the Protections of Individual Rights*, 90 HARV. L.REV. 489, 491 (1977) [hereinafter *State Constitutions* ] ). While I agree that we must and should decide independent questions of Texas constitutional law when necessary,[22] this case presents no reason to do so.

In 1977, Justice Brennan delivered his now famous plea for state courts to look to their own constitutions as a means to extend individual rights beyond the requirements of the United States Constitution. *See State Constitutions, supra* at 491. While state constitutions contain express provisions for the protection of individual rights not found in the United States Constitution, *see, e.g.*, TEX. CONST. article I, section 3a (equal rights guarantee), and state courts have for years applied state constitutional provisions and analogous federal constitutional provisions differently for reasons of history and language, the new federalists argue that federal court interpretations of *identical* provisions may never be binding upon state courts, only persuasive:

*[O]nly* if they are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, may they properly claim *persuasive weight* as guideposts when interpreting counterpart state guarantees.

*State Constitutions, supra* at 502 (emphasis added). Justice Brennan's enthusiasm for state constitutional guarantees is necessarily confined to scholarly writings, as the Supreme Court will usually decline to reverse cases decided on independent state grounds.[23] Some state courts have nonetheless heeded his call. *See Developments in the Law—The Interpretation of State Constitutional Rights*, 95 HARV.L.REV. 1324 (1982); James A. Gardner, *The Failed Discourse of State Constitutionalism*, 90 MICH.L.REV. 761 (1992).

In a survey of 2,800 state supreme court decisions relying on independent state constitutional grounds, two political scientists recently discovered that state judges nullify statutes in these cases at twice the rate they do so under the United States Constitution. Craig F. Emmert & Carol Ann Traut, *State Supreme Courts, State Constitutions, and Judicial Policymaking*, 16 THE JUSTICE SYSTEM J. 37, 47 (1992). The authors observed that "[s]tate courts are evidently more activist when the challenges are made on state constitutional grounds." *Id.* at 42. The cause of such activism, the authors concluded, is that state supreme courts are more "comfortable using their state constitutions to overturn laws," well aware that there is no chance of reversal by the United States Supreme Court in such cases. *Id.* at 47.

A pattern has emerged in cases like this one, in which the court "rediscovers" portions

---

22. For example, in the area of public school finance there is no federal analogue to art. VII, § 1, of the Texas Constitution. *See Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391 (Tex. 1989). Similarly, the Texas Constitution expressly identifies rights, such as equality under the law, TEX. CONST. art. I, § 3a, the right to the writ of habeas corpus—which *may not be suspended*, even in cases of rebellion or invasion of the public safety, TEX. CONST. art. I, § 12, *compare*, U.S. CONST. art. I, § 9, or the right against outlawry, TEX. CONST art. I, § 20. Finally, differences between a section of the Texas Constitution

and an analogous section of the United States Constitution may obviously and unambiguously compel this court to reach a result that differs from a prior opinion of the Supreme Court. However, we do not face any of these circumstances in this case.

23. *See* Jean F. Rydstrom, Annotation, *What Constitutes Adequate and Independent State Substantive Ground Precluding Supreme Court Review of State Court Decision on Federal Question*, 59 L.Ed.2d 924 (1980).

of the Texas Constitution that correspond to sections of the United States Constitution. This pattern has three main attributes. First, this court will ignore an immense body of decisional authority relating to the analogous federal provision, developed over decades in the federal courts, and insist on "traversing the largely uncharted terrain ... of [our state] constitution"—even when there is an established basis under the federal constitution for the same result. *See Davenport*, 834 S.W.2d at 29 (Hecht, J., concurring). Second, when there turns out to be little state authority and the court turns to federal precedent, the court regards the federal court authorities as merely "helpful" and in no way authoritative—even if we previously interpreted our state provision to be coextensive with the federal provision. *See id.* at 33–35. Third and most troubling, the state constitutional provision is invariably asserted to be somehow *different from and broader than* the virtually identical federal provision. *See, e.g.*, 872 S.W.2d at 197, n. 23; *Ex parte Tucci*, 859 S.W.2d 1, 7–8 (Tex.1993); *Davenport*, 834 S.W.2d at 8–9; *see also State Constitutions, supra* at 495.

A metaphor is frequently invoked to describe the effect of the new federalism: The United States Constitution provides a "floor" for individual rights below which states may not drop because the decisions of the United States Supreme Court interpreting that document apply to the states; conversely, the Texas Constitution provides the "ceiling." *See, e.g.*, Paul W. Kahn, *Interpretation and Authority in State Constitutionalism*, 106 Harv.L.Rev. 1147, 1148 (1993). In this case, however, the court may have gone so far that the metaphor no longer applies. The reason for this is the result obtained when combining substantive due process and the new

federalism. Until this case, courts employing substantive due process have refused to transform it from a negative doctrine—a check on state action that interferes with individual liberty—into an affirmative doctrine that requires the government to exercise its power to provide individuals some remedy or relief:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act.... It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law" but its language cannot fairly be extended to impose an affirmative obligation on the state to ensure that those interests do not come to harm through some other means. Nor does history support such an expansive reading of the constitutional text....
>
> [O]ur cases have recognized that the Due Process clauses generally confer no affirmative right to governmental aid, even when such aid is necessary to secure life, liberty, or property interests which the government may not itself deprive the individuals.

*DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 195–96, 109 S.Ct. 998, 1002–04, 103 L.Ed.2d 249 (1989); *see also Collins v. City of Harker Heights*, —— U.S. ——, —— – ——, 112 S.Ct. 1061, 1068–70, 117 L.Ed.2d 261 (1992); *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).

The court grants Larry a right to establish "a relationship" with his child.[24] The only

---

**24.** It is difficult to reconcile today's opinion with the typical effect of an opinion declaring a statute unconstitutional: "[U]nder *Marbury* the court decides a case; it does not pass a statute calling for obedience by all within the purview of the rule that is declared." Lawrence Tribe, American Constitutional Law 28 (2d ed. 1988) (citing Herbert Wechsler, *The Court and the Constitution*, 65 Colum.L.Rev. 1001, 1008 (1965)). Simply because the court has declared that the state may do nothing to deprive Larry K. of rights should not mean that the state must now take any action on his behalf. In part, the problem stems from

the court's initial sophistic characterization of the statute as "denying" Larry K. "the opportunity to ... claim parental rights." A "right to an opportunity," to my knowledge, is something unprecedented in constitutional law. *See Collins*, —— U.S. at —— – ——, 112 S.Ct. at 1068–70; *DeShaney*, 489 U.S. at 196, 109 S.Ct. at 1003; *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980).

The court holds that Larry has a "constitutionally protected" right, and that two sections of the Texas Family Code are unconstitutional. This could mean that nobody can sue to establish

thing that prevented Larry from establishing this relationship before the court took action was the resistance of J.W.T.'s family. Thus, there could have been no due process violation. However, in creating this new right, the court has in effect given the State of Texas a mandate to exercise its police power on Larry's behalf—to require paternity tests, to order visitation or even custody if it is proper to do so, and to use the full enforcement apparatus of the state to guarantee Larry's rights just as the state would enforce any other parent's right.

The court accords *no value* to the state's interest in protecting families. The only countervailing interest the court acknowledges is that of the child, which the court *says* is paramount, but the ultimate resolution seems to me to be irreconcilable with this assertion. Substantive due process advances no particular point of view—it only frees a court from constitutional restraints so that it can identify and protect any "right" it desires, whether it be the right to contract, the right of visitation, or the right to be free from visitation. Under this form of unrestricted substantive due process, the transition from adjudication to legislation is seamless. The court can identify virtually any right and require the state to enforce it. The danger this presents is that the United States Constitution will no longer provide a "floor" if this court identifies "constitutional rights" on behalf of some individuals that require the state to take affirmative action that infringes on the rights of others. *See generally* Albert H. Kauffman & Carmen Maria Rumbaut, *Applying Edgewood v. Kirby to Analysis of Fundamental Rights under the Texas Constitution,* 22 ST. MARY'S L.J. 69 (1990); *cf. Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 82–85, 100 S.Ct. 2035, 2041–43, 64 L.Ed.2d 741 (1980) (raising "ceiling" of expressive rights under state constitution may lower "floor" for property rights protection). Because state courts have heretofore avoided the legislative variety of sub-

stantive due process, it is entirely unclear how the Supreme Court would treat such potential conflicts under the Supremacy Clause, U.S. CONST. art. VI, cl. 2.

Unrestrained implementation of substantive due process provides the courts with no guidance as to which "right" is paramount. Once freed from the constitutional text, courts can no longer look there for guidance. What will remain is precisely what Justice White warned about in *Moore v. City of East Cleveland,* 431 U.S. 494, 502, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977):

> There *are* risks when the judicial branch gives enhanced protection to certain substantive liberties without the guidance of the more specific provisions of the Bill of Rights. As the history of the *Lochner* era demonstrates, there is reason for concern lest the only limits to such judicial intervention become the predilections of those who happen at the time to be members of this [c]ourt. That history counsels caution and restraint.

Now that the putative father has standing to establish a "relationship" with his biological child, the barriers are minimal to his seeking 1) outright possession of the child through custody proceedings, 2) visitation rights, 3) the authority to direct or at least participate in the child's moral and religious training, 4) management of the child's estate, 5) access to the child's services and earnings, and 6) representation of the child in legal proceedings. It takes little imagination to understand the havoc the court's decision will wreak on the life of a child when an outsider to the marital family files suit, establishes paternity, and the lawyers proceed to litigate (perhaps until the child reaches majority), the most intimate and emotional decisions traditionally made by parents on behalf of the family. There is little reason to be optimistic about the manner in which "parents" under the circumstances presented in this case will re-

---

parenthood or visitation rights until the legislature passes a new statute granting Larry that right, or perhaps that no biological father may sue for his rights in the absence of legislation recognizing that biological fathers of children born to married couples have a right to sue. On the other hand, this case may mean that regard-

less of what the legislature does (including repealing the Family Code altogether), the Texas Constitution guarantees biological fathers the right to establish paternity, visitation, and even custody rights. This latter interpretation, however, is contrary to any prior practice under the constitutions of Texas or the United States.

solve the conflicts that will almost certainly arise.

Finally, the court says: "[O]ur decision does not jeopardize the adoption process." 872 S.W.2d at 198, n. 26. Hope Cottage, Inc., The Methodist Home, The Gladney Center, and Lena Pope Home, Inc., all of whom have appeared as *amici curiae* in this appeal and all of whom provide adoption services in our state, disagree.[25] These adoption agencies argue that the best interests of Texas children compel a different outcome in this case, and that under this court's decision there is no impediment to a putative father asserting parental rights to a child who has been adopted. Yet the positions of these *amici* are dismissed in a footnote.

## VIII. Conclusion

An appellate court's identification in its opinion of an established legal rule or method of analysis, and the court's explanation for how that rule or method is applied in a case to reach a decision, are among the most basic attributes of the judicial decisionmaking process. If followed, this process permits others to apply independent scrutiny and perhaps disinterested criticism. RICHARD A. WASSER-STROM, THE JUDICIAL DECISION: TOWARD A THEORY OF JUSTIFICATION 159 (1961). This process also imposes a desirable discipline on judges, requiring us to explain how an announced rule, applied to given facts, logically supports the court's judgment. Depending on how well this justification succeeds, it either adds to or detracts from the public perception of legitimacy of a court's role in our republican form of government.

In this case, however, under the guise of an independent state constitutional interpretation, the court 1) disregards contrary precedent by the United States Supreme Court; 2) eschews our traditional constitutional analysis and creates a new constitutional right nowhere found in the text of the Texas Constitution or its history; 3) revives substantive due process in a particularly arbitrary new form; and 4) fails to identify and consider any of the substantial countervailing state interests reflected in these statutes.

For these reasons, I respectfully dissent.