Opinion issued June 7, 2018



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-17-00961-CV

_____

## IN THE INTEREST OF L.L.C., A CHILD

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-03967J**

---

## MEMORANDUM OPINION

This is an appeal from the trial court's order terminating a mother's parental rights to her daughter. The trial court found that termination was warranted under Texas Family Code subsections 161.001(b)(1)(D), (E), and (O), and that termination was in the best interest of the child under subsection 161.001(b)(2). The mother challenges the factual sufficiency of the evidence supporting the trial court's finding

that termination was in the child's best interest. We conclude that factually sufficient evidence supports the finding and therefore affirm.

## BACKGROUND

Lara (a pseudonym) was born in California in August 2015. At the time, the state of California had the mother under witness protection in connection with the criminal case against Lara's father, now a convicted sex trafficker.[1] In April 2016, the mother left California with Lara to avoid testifying against the father. She came to Texas at the invitation of an online acquaintance, Cassius Johnson, who told her he had a job for her. Johnson sent a woman to the bus station to meet the mother and child. When they arrived at Johnson's house, the woman took Lara. Johnson kept Lara away from the mother and sent the mother to the Dallas area to prostitute for him.

In June 2016, police in Austin took the mother into custody after a traffic stop led to the discovery of an outstanding warrant for felony theft based on an incident that had occurred in 2012. After she was released from custody, the mother received housing and support services from a community women's center. The shelter provided her with an advocate who helped her leave prostitution and establish a stable and law-abiding lifestyle.

---

[1] The trial court also terminated the father's parental rights. The father has not appealed that ruling.

In early July, the mother called the Longview Police Department to report that her pimp had prevented her from seeing her child. She said that the pimp kept the child in Houston and sent the mother to Longview, and he was forcing her to engage in prostitution by withholding contact from the child. The Longview Police Department contacted the Houston Police Department about the mother's report. HPD arrested Johnson, recovered Lara, and placed Lara in the custody of the Department of Family and Protective Services (the Department). The Department petitioned for child protection, conservatorship, and parental termination a few days later.

The mother told the Child Protective Services caseworker that she could not come to Houston and had no appropriate relative to care for the child, because her own mother had attempted to sell her for drugs when she was an infant. The mother also informed the caseworker that her aunt was caring for her older child. She refused to provide the aunt's information to the caseworker.

In mid-July, the trial court held a hearing and signed temporary orders. In late August 2016, the trial court signed an order requiring the mother to comply with the requirements of the family service plan developed for her by the Department.

Approximately one year later—when the mother was seven months' pregnant with her third child—she called police to her home. She reported that a man in her apartment had engaged in an altercation with the third child's father. When the

police arrived, the mother claimed that the man, whom she believed to be a drug dealer, had taken her keys and pushed his way into her apartment. The man told the police a different story, informing them that he had been living in the home with the mother for about two weeks and was helping to pay the rent.

The mother initially denied knowing the man, but eventually conceded that she knew him. The police found men's clothing in the bedroom. In the living room, the officers found plastic sandwich bags containing marijuana, marijuana cigarettes, and a jar containing the drug known as K2. When the officers asked the mother about the drugs, she told them that the man put them there "possibly to set her up."

The police obtained a search warrant and conducted further investigation. Officers found more bags of marijuana hidden in a larger bag near the kitchen, another bag of marijuana in the bedroom, and a scale with marijuana residue hidden under a mattress. The officers did not arrest the mother.

The mother completed some of her family service plan requirements, including her psychosocial assessment, her psychiatric assessment, and her substance abuse assessment. At the termination hearing, the mother admitted that she had not complied with family service plan requirements that she (1) refrain from any involvement in criminal activity, (2) maintain a positive support system that is safe, crime-free, drug-free, and alcohol-free, and (3) maintain housing that is safe,

stable, and free of environmental hazards for a minimum of six consecutive months. The mother denied using marijuana.

The random urine testing conducted during the case were negative for marijuana and other illegal substances. However, the mother's hair follicle drug-test results showed high levels of marijuana exposure in July, August, and December of 2016, as well as in March and June of 2017. During much of that time, the mother was pregnant with her third child. The mother admitted to spending time around people who use marijuana. She agreed that an apartment filled with drugs is not a safe environment for a child.

By the November 2017 trial date, the mother had given birth to her third child. She was living in an apartment with the child and the child's father. The mother admitted that her third child's father has a CPS and a criminal history. She told the trial court that she planned to stay with him. The mother testified that she no longer worked as a prostitute and had a job providing health care assistance for the elderly. The caseworker acknowledged that the mother currently has a stable lifestyle.

The mother has not held any job for longer than three months. The CPS caseworker attested that the mother had three or four different jobs during the pendency of the case. She opined that the mother was not always honest about why she lost a job; when the caseworker followed up with the former employer, for example, the employer gave a different reason for termination than the mother had.

5

The Department moved Lara to a foster home in Dallas about eight months before trial so that she would be closer to the mother. The foster family would like to adopt Lara. With regard to the mother's twice monthly court-scheduled visits, the foster mother testified that the mother had missed three of her visits and frequently had arrived late for other visits. The caseworker testified that Lara appeared bonded to the foster parents and their two daughters; she appeared happier and to be flourishing. The caseworker observed that the foster parents are dedicated to providing for Lara's emotional, developmental, and therapeutic needs. The foster mother arranged for Lara's early-childhood intervention services and follows all recommendations.

The Department's permanency report reflects that the mother's therapist recommended that Lara be reunited with her mother. The mother also provided the court with a letter from her therapist. The therapist reported that the mother had participated in 42 weekly sessions since she began receiving services from the women's center in July 2016. The therapist observed that the mother has shown dedication to completing the CPS requirements for becoming reunited with Lara. The mother's victim advocate at the center also provided a letter in support of the mother, reporting that the mother "has stayed away from her trafficker, and the lifestyle that often accompanies sex trafficking. She is not perfect and has had some

6

difficulties, and made some mistakes, but she seems to learn from them rather quickly."

The caseworker, on the other hand, opined that termination of mother's parental rights would be in child's best interest. With respect to the mother, the caseworker noted that she had not demonstrated and applied everything that she learned in her sessions, observing that she "still socializes with people who have a history with drugs," and was living with a man—her youngest child's father—who has a CPS and a criminal history. The caseworker stated that, if the foster family was permitted to adopt Lara, they would provide her with a nurturing environment to grow up in and give her the kind of love she deserves.

The foster mother, a pediatric therapist, confirmed the family's strong interest in adopting Lara. She explained that Lara has been diagnosed with developmental and cognitive delays, fine motor and speech delays, post-traumatic stress disorder, and anxiety. To meet these special needs, Lara has the support of various professionals, including a pediatrician, a neurologist, and an early-childhood intervention team, as well as speech and occupational therapists. The foster mother explained that her training in psychology and experience in providing therapeutic services to other foster families and children with special needs help her ensure that Lara has all the support services she needs, so that Lara can "at some point,

hopefully, have a normal productive lifestyle." In addition, the foster mother noted, Lara has the support of the family and their large church community.

The foster mother testified that Lara had become extremely bonded to her family. She calls the foster parents "mommy" and "daddy," and is very attached to her foster sisters. When Lara arrived at the foster home, she could say only three words, but by the time of trial, she had a vocabulary of 48 words. The foster mother observed that Lara has thrived in her home and has "grown so much." The foster mother expressed that she and her husband can provide Lara with the stability, emotional resources, and therapeutic resources she needs. The foster mother further testified that, as she has previously told the mother, the family would be willing to have an open adoption as soon as the mother shows that she is committed to a stable lifestyle, so that the mother and Lara can continue to have a relationship.

## TERMINATION OF PARENTAL RIGHTS

A. **Standard For Reviewing Challenges to the Termination of Parental Rights**

A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *accord In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). We therefore strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Parental rights,

8

however, are not absolute and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that a parent may forfeit his or her parental rights by their acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

In a case to terminate parental rights by the Department under section 161.001 of the Family Code, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and, (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *see In re J.F.C.,* 96 S.W.3d 256, 264 (Tex. 2002).

## B.   Finding That Termination is in the Child's Best Interest

As a matter of public policy, "the best interest of a child is usually served by maintaining the parent-child relationship." *J.F.C.*, 96 S.W.3d at 294. In evaluating an order terminating that relationship, however, the "protection of the child is paramount" and "the rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *A.V.*, 113 S.W.3d at 361 (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)). Accordingly, appellate courts review the entire

9

record to decide what is in the best interest of the child. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). In conducting this review, we are guided by the non-exclusive list of factors set forth in *Holley v. Adams*. *See* 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id.*

Evidence establishing one of the predicate acts under section 161.001(b)(1) may be relevant to determining the best interests of the child, including endangerment of the child. *In re A.M.*, 495 S.W.3d 573, 581 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). The Department need not prove all of the best-interest factors as a condition precedent to parental termination, "particularly if the evidence was undisputed that the parental relationship endangered the safety of the child. *C.H.*, 89 S.W.3d 17, 27 (Tex. 2002), *quoted in In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

## C.    Analysis

The trial court determined that three statutory grounds justified termination of the mother's parental rights, finding that the mother (1) knowingly placed or allowed the child to remain in conditions or surroundings which endangered her physical or emotional well-being; (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered her physical or emotional well-being; and (3) failed to comply with the requirements of her family service plan. *See* TEX. FAM. CODE § 161.001(1)(D), (E), (O).  The mother does not challenge these predicate findings.

Lara has not lived with her mother since she was nine months old.  At that time, the mother left Lara with strangers for approximately three months while those strangers forced the mother to prostitute herself in another city.  The mother eventually sought support in leaving prostitution and asked the authorities to intervene and remove Lara from the situation, but not for a period of months and after the mother's arrest on a theft charge from years earlier.

At the time of trial, Lara was two years old. She had lived for eight months with the foster family, who wish to adopt her.  Her foster mother testified at length concerning Lara's emotional and physical needs, explaining that Lara is supported by a team of professionals to address her PTSD and anxiety diagnoses as well as her delays in communication, cognitive development, social, and emotional

11

development, and motor skill development. Lara has made significant progress since she has been in the foster home. The foster mother assured the court that Lara will continue to receive all of the services she needs to help her become as independent as possible in adulthood.

The mother testified that she would give Lara a mother's love. She did not address Lara's need for services to address her developmental and cognitive delays. The mother has had jobs, but none lasting longer than three months. According to the caseworker, the mother did not acknowledge the reasons she lost the jobs, which suggests an unwillingness to acknowledge and correct mistakes that have prevented her from obtaining stable employment.

The mother identified her women's center advocate as a source of support for her. She did not name any family members or friends in her area to whom she looked for support. The mother has lived around heavy users of marijuana, including during the period she was to work on the family services plan and while pregnant with her third child. She acknowledged that these living conditions did not provide a safe and stable environment for a child. The mother did not express concern or anticipate any difficulties in having Lara live with the father of her third child despite his criminal and CPS history.

The foster mother described the typical weekday routine in her family, which demonstrated a safe, stable, and enjoyable home life. Lara loves to play with her

foster sisters and is considered a member of the family. The foster mother also described the family's church as providing a community of support for Lara. The foster family has provided Lara with the nurture, stability, and support she needs. The parents have expressed a desire to adopt Lara.

The trial court was faced with conflicting evidence about the child's best interests. It is undisputed that the mother placed Lara in physical and emotional danger when Lara was in her care, but the mother herself was a victim of human trafficking. Since that time, the evidence shows that the mother has made significant progress toward living a stable and law-abiding life. The mother regularly visited Lara during the family service plan period. The trial court also heard testimony about the psychological effects on Lara of her life while in her mother's care, the mother's lack of stable employment and housing, and her lack of awareness of the risk of drug use in the home. Based on this evidence, the trial court reasonably could have formed a firm conviction and belief that the mother has not achieved a safe and stable environment for Lara.

In light of the entire record, we hold that factually sufficient evidence supports the court's firm conviction and belief that termination of the mother's parental rights was in the child's best interest.

**CONCLUSION**

We affirm the judgment of the trial court.

                                                    Jane Bland
                                                    Justice

Panel consists of Justices Keyes, Bland, and Massengale.